**Robert E. SHERWOOD, Appellant,**
v.
**UNITED STATES of America,**
Appellee.
No. 18880.

United States Court of Appeals
Fifth Circuit.
March 30, 1962.

**604**

Claude E. Hambrick, Jr., Atlanta, Ga., for appellant.

Charles D. Read, Jr., U. S. Atty., John W. Stokes, Jr., Asst. U. S. Atty., Charles L. Goodson, U. S. Atty., Bobby C. Milam, Asst. U. S. Atty., Werner Goldman, David B. Bliss, Attys., Securities and Exchange Commission, for appellee.

Before RIVES, BROWN, and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

Robert E. Sherwood appeals from his conviction under 15 U.S.C.A. § 77q(a) for employing a scheme to defraud by use of the mails in the sale of securities.[1] Sherwood acknowledges that his associate, Leon Cohen, operated a scheme to swindle investors by the sale of stock in a fictitious corporation. He contends, on appeal, that the evidence does not support the verdict that *he* caused the mails to be used or that he participated in the Cohen scheme. We hold that substantial evidence supports the verdict and affirm the conviction.

Leon Cohen organized Continental Underwriters, Inc., the vehicle for his operations, in February 1958 and incorporated it under Georgia law. Cohen and his partners purchased its 30,000 shares of $5 par value common stock, transferring to the corporation other stock of doubtful value or their personal notes. The corporation never engaged in any business or earned any profits. A few months after the corporation was organized, the insiders began a secondary distribution of the stock to members of the public. They made these sales through Southern States Securities, Inc., a corporation organized in December 1957. Cohen installed Sherwood as president of Southern in May 1958, and Sherwood purchased the corporation for $43 advanced by Cohen. He then recapitalized Southern, bought all its new stock for $5,000, which he also borrowed from Cohen, and pledged the stock to Cohen as collateral on the loan. During the next eight or nine months Sherwood received a salary from Southern that ranged up to one thousand dollars a month. Since he was licensed as a broker with the state of Georgia, Sherwood was qualified to hire securities salesmen. He hired several salesmen for Southern and arranged for them to be licensed also. The salesmen then set out to peddle the

1. 15 U.S.C.A. § 77q(a) reads as follows:
"It shall be unlawful for any person in the sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
"(1) to employ any device, scheme, or artifice to defraud, or
"(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
"(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

Continental stock; this was just about the only business handled by Southern during Sherwood's presidency. Sherwood's job was to manage the office. When calls came in he answered questions put to him by prospective customers and gave quotations on the market price of Continental stock. The sales campaign was successful. Innocent investors purchased a large portion of the stock, much of it at twenty dollars a share. With the proceeds from the first sales, the corporation paid false dividends to keep the scheme going. The stock, the dividends, and other papers and materials integrally related to the transactions were mailed back and forth between the customers and the corporation and the insiders as a matter of course in the operation of this scheme. Sherwood handled the bookkeeping for Southern and kept its record of these sales. Frequently, Sherwood simply endorsed checks received from customers in payment for stock and delivered the checks directly to Cohen without making entries to reflect the transaction on Southern's records. Sherwood testified that he knew at the time this was not a usual method for handling such transactions.

■ This evidence cuts to pieces Sherwood's innocent-faced assertion that he was not a participating member in the fraudulent scheme. He may not have originated the scheme, but he was in the center of its operation. Nearly every sale of Continental stock passed through his hands, and at least once he participated in a sale personally. It is inconceivable that he did not know anything about the stock he and his salesmen were selling, especially in view of the fact that Continental stock was virtually the only stock they were selling for an eight or nine month period. It is not plausible that Sherwood could have failed to have his suspicions aroused by the irregularity of

Cohen's instructions to deliver checks to him directly without reporting them on Southern's records. The evidence fully supports the verdict that Sherwood was an active and knowing participant in this illegal scheme.[2]

■■ Given the conclusion, as found by the jury and well documented by the record, that Sherwood was an active participant in the scheme, his argument that he was not shown to have used the mails is frivolous. The record teems with evidence that the mails were used regularly to carry out the scheme. The prosecution presented a parade of witnesses who testified that they had purchased stock in the swindle and had received the stock or dividends or other materials through the mails. This was not a merely incidental use of the mails or a use made by outsiders after the fraud was completed. Compare Kann v. United States, 1944, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88; Getchell v. United States, 5 Cir., 1960, 282 F.2d 681, 683–84. This was a case where "the mails [were] used prior to, and as one step toward, the receipt of the fruits of the fraud." Kann v. United States, supra, 323 U.S. at 94, 65 S.Ct. at 150, 89 L.Ed. 88. See United States v. Kenofskey, 1917, 243 U.S. 440, 37 S.Ct. 438, 61 L.Ed. 836. Whether or not Sherwood himself used the mails, their use by his fellow participants in the scheme would be attributed to him and would bring him in violation of the mail fraud statute. Kann v. United States, supra, 323 U.S. at 93, 65 S.Ct. 148, 89 L.Ed. 88; Steiner v. United States, 5 Cir., 1943, 134 F.2d 931, 934; Weiss v. United States, 5 Cir., 1941, 120 F.2d 472, 475; Silkworth v. United States, 2 Cir., 1926, 10 F.2d 711, 717, cert. den'd, 271 U.S. 664, 46 S.Ct. 475, 70 L.Ed. 1139.

The conviction is

Affirmed.

2. In a similar case, United States v. Tellier, 2 Cir., 1958, 255 F.2d 441, 450, cert. den'd, 358 U.S. 821, 79 S.Ct. 33, 3 L.Ed. 2d 62, the court stated: "Whether or not Proctor was aware of the high pressure tactics employed by Tellier to sell the debentures, the active role which Proctor played in the affairs of the corporation surely justified the jury in believing that he was aware of the fraud perpetrated upon the purchasers of the debentures."