**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Sidney FLAXMAN, Defendant-Appellant.**

**No. 73–1616.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 31, 1973.

Decided April 23, 1974.

Charles A. Bellows, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., William T. Huyck, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before KILEY, Senior Circuit Judge, and PELL and SPRECHER, Circuit Judges.

PELL, Circuit Judge.

Appellant Sidney Flaxman and four former officials of the Steinberg-Baum Company discount stores were named in an eight-count indictment charging conspiracy and mail fraud, 18 U.S.C. §§ 371, 1341. The indictment alleged, *inter alia*, that false retailers' occupation tax returns had been submitted to the State of Illinois. From January 1, 1968, through January 30, 1971, the returns submitted had understated sales by approximately $32 million, resulting in a

loss of revenue to the State of Illinois of roughly $1.5 million.

Only Flaxman, a CPA hired to prepare the Company's occupation tax returns and federal income tax returns, stood trial.[1] After a bench trial, the court found Flaxman guilty as charged. The court sentenced the defendant to concurrent two-year prison terms on the first four counts and to probation for two years on the last four counts, the term of probation to be served consecutively to the imprisonment.

On this appeal, Flaxman raises four issues: (1) whether the evidence was sufficient to sustain the court's finding on Count I, the conspiracy count; (2) whether mailings of the Illinois tax returns were an integral part of the defendants' scheme; (3) whether the Government presented sufficient evidence of the use of the United States mails; and (4) whether the evidence proved that Flaxman had had the intent to defraud.

I

Since the same evidence reflects on both the first and fourth contentions, we will consider them together. Flaxman first started to prepare the state tax returns in 1962 or 1963. One of the office workers would give the defendant the total sales figures for each of the Steinberg-Baum stores. There were thirteen retail stores, each of which was a separate corporation. According to Flaxman, when he first prepared a retailers' occupation tax return and showed it to Louis Steinberg, president of the companies and named in the indictment as a co-conspirator, Steinberg told him that he had not taken into account the wholesale sales. From a notebook, Steinberg gave Flaxman the amounts of wholesale sales which he, Steinberg, said should have been deducted.[2]

Flaxman then made the return showing the gross receipts and the net fig-ures after deducting the supposed wholesale sales amounts. After he showed this to the president, Steinberg insisted that he wanted only the net taxable figure stated on the return. Flaxman accordingly prepared the return and all subsequent returns in this fashion, although the tax form clearly called for "Total Receipts from sales of Tangible Personal Property and Services," followed by "Total Deductions Authorized by Law," the first category of which was "Receipts From—Sales Made for Purposes of Resale," i. e., wholesale sales.

Flaxman was not an employee of the company but was an independent professional man, a certified public accountant who by the manner of filling out the returns, which he did personally, was participating in a representation to the state taxing authority that the amounts reported were the total or gross sales including wholesale sales, whereas in fact the figure reported would have been a net figure after deducting the purported wholesale sales. The wholesale sales amounts furnished by Steinberg were fictitious and generally amounted to 90% of the total sales.

Flaxman testified that he relied upon Steinberg's assertion that he could prove the wholesale figures, that it was not his responsibility to look behind the figures furnished by the taxpayer, and that he had been told that the net figure could be used for the total sales amount when he had been an employee of the Illinois Department of Revenue.

The district court obviously did not find Flaxman a credible witness, and we, of course, are not to second guess the trier-of-fact's determinations of credibility. Aside from disbelief of some of this testimony on a credibility basis, we note that while Flaxman relied on a bulletin from the American Institute of Certified Public Accountants on the

---

1. Three of the other defendants pleaded guilty. The fourth became a fugitive.

2. The occupation tax is measured by the gross receipts from sales of tangible personal property at retail. It is designed to cover retail sales only. Theo. B. Robertson Products Co. v. Nudelman, 389 Ill. 281, 59 N.E. 2d 655 (1945).

scope of the accountant's responsibility, that bulletin also stated that the "CPA cannot ignore the implication of information known by him . . ."

There is more than sufficient evidence here to support a reasonable inference that Flaxman was engaged in a covert procedure with regard to reporting the sales income of the involved companies. He ignored the plain language of the return form, which called for total sales income and authorized deductions to be listed separately.[3] The return had a place for the signature of the person, other than the taxpayer, preparing the return. Flaxman never put his signature on the returns even though he prepared the returns, typing the final return himself. He gave as his reason for not signing that he had not made any examination of the wholesale sales. However, the form did not call for signature by an auditor of the books but by the preparer of the return.

Although Flaxman ignored the itemization for deductions authorized by law, he did apparently compute what the occupation tax would be for the total receipts item, which was to include tax collected by the stores, and he would then deduct this amount to determine the tax to be paid. This amount could have had virtually no relationship to the amount of tax actually collected from customers because the reported figure of total receipts, which included tax collected, was only, as indicated hereinbefore, about 10% of the actual total. He had been at the two stores the returns for which were the subject of the various counts of the indictment, had seen their advertisements in the newspapers, and admitted on the stand that they were what one would call retail stores. Yet he expressed no scepticism that 90% of their receipts were of wholesale character.

■ As the district court said in sentencing the defendant, "He cannot hide behind the shield of the accounting manual practice and procedures . . . [H]e cannot shut his eyes to what he must understand is erroneous information . . . . He had to know what was wrong." There was sufficient evidence of intent to defraud.

■ As to Count I, Flaxman argues that the Government failed to prove beyond a reasonable doubt that he had entered into an agreement with anyone to commit the offense charged in the conspiracy count. However, "[i]t is well settled in our Circuit that no formal agreement is necessary to constitute a conspiracy to commit an offense under 18 U.S.C. § 371 . . . ." United States v. Robinson, 470 F.2d 121, 123 (7th Cir. 1972). The Government may rely upon circumstantial evidence of the concert of action among the defendants. Further, a conspirator need not participate in all the activities of a conspiracy in order to be held liable for the unlawful scheme. United States v. Cardi, 478 F.2d 1362, 1368–1369 (7th Cir. 1973); United States v. Fellabaum, 408 F.2d 220, 224 (7th Cir. 1969), cert. denied, 396 U.S. 858, 90 S.Ct. 125, 24 L.Ed.2d 109.

3. The Illinois statute, Chapter 120, § 442, in pertinent part provided: " . . . on or before the last day of each calender month, every person [including corporations] engaged in the business of selling tangible personal property at retail in this State during the preceding calendar month shall file a return with the Department, stating:

 \* \* \* \* \*

3. Total amount of receipts received by him during the preceding calendar month from sales of tangible personal property . . .

 \* \* \* \* \*

5. Deductions allowed by law . . . ."

"The statute sets forth with great detail the matters which must go into the monthly return, and lays down a guide which, when followed, leaves nothing open for arbitrary discretion." Department of Finance v. Cohen, 369 Ill. 510, 516, 17 N.E.2d 327, 329 (1938).

The evidence which we have reviewed in our opinion clearly is sufficient to establish by circumstantial evidence that Flaxman, although he originally had attempted to set up the figures on the return in a manner of proper disclosure, did ultimately agree to the covert procedure and this agreement continued through subsequent years during which Flaxman utilized the supposed relatively minimal retail sales figures as furnished by Steinberg.

The fair inference from Flaxman's testimony, and for the present purposes we have accepted his version on this phase of the case, is that he secured the supposed wholesale sales figures each time from Steinberg, thus assuming Steinberg's availability month after month over several years time. In this connection, it is to be noted that the employee, Williams, who turned the actual total receipts figure over to Flaxman, testified that it was not usual for Flaxman to go in to talk to the "bosses." If this was true, the participation in the scheme by Flaxman was even more patent. There was evidence from General Manager Freedman that Steinberg-Baum's policy was to report only about 10% of actual retail sales. If Flaxman did not get the monthly figure from Steinberg, the inference is strong that he was automatically implementing the 10% agreed upon policy.

■ Under either approach, the circumstantial evidence is sufficient to support the conspiracy conviction.

## II

Defendant next asserts that "the mailings of the sales tax returns here occurred after the scheme had been essentially accomplished . . . ."

A Steinberg-Baum employee testified that the Illinois Department of Revenue supplied preprinted envelopes for the occupation tax returns and that it was her practice to put the completed returns in the envelope provided by the State and then to place the envelope in the office's outgoing mail container. Prominently placed on the front of the forms issued by the State was the instruction: "— Mail to—Retailers' Occupation Tax Division, 400 South Spring Street, Springfield, Illinois 62706." Thus, the misrepresentations that constituted the fraud were contained in documents that were to be sent through the mails.

■ However, even assuming that the returns could have been delivered to Springfield by private messenger, an essential part of the scheme to defraud was the delivery, and here it was by United States mail, bringing the activity in question within federal criminal jurisdiction.

Subsequent to oral argument in this case, the United States Supreme Court handed down its decision in United States v. Maze, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). The defendant in his brief, however, relied on earlier cases to the same effect as *Maze*, such as Kann v. United States, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944). Nothing in this line of cases, including *Maze*, in our opinion is of help to Flaxman. In *Maze*, the scheme had reached fruition when the credit card was used. Subsequent mailing did not forward the scheme so far as the perpetrator was concerned. His scheme had been accomplished. Here, however, the delivery to the revenue office was an integral part of the scheme.

It would appear that a person who desires to evade taxes could take one of two principal routes. He could just decline to file a return or he could file a return with false figures. The first path, of course, would not require any delivery, but it leaves the perpetrator in the position of being on the face of the matter a law violator. The second route places him in the facial position of having complied with the law, and in the absence of an audit, or the matter being

brought to the attention of the taxing authorities by an informer, he is home free. Thus, under the semblance of compliance course, the most significant act to accomplish the scheme was the delivery to Springfield. Fruition was brought about directly by the use of the mails.

 Just because the State of Illinois was the victim and makes such a scheme illegal does not preclude the Federal Government from prosecuting the perpetrators under an applicable federal law. Parr v. United States, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960).

### III

 Some of the same factors bear on the related issue of whether the Government met its burden on the use of the mails. In addition to the testimony about the procedures used in the Company's office, there was evidence that the returns were in fact received by the Illinois Department of Revenue. The checks accompanying the returns, some of which were introduced into evidence, had been negotiated and obviously also had reached the Department of Revenue. Further, witness Jankovich stated that she sent deposits to banks in the same manner and that she received deposit slips acknowledging receipt of the deposits. Evidence of office custom and procedure is acceptable to establish the fact of mailing where the witness did not personally place the letter in a U. S. mailbox. United States v. Fassoulis, 445 F.2d 13, 16–17 (2d Cir. 1971), cert. denied, 404 U.S. 858, 92 S.Ct. 110, 30 L. Ed.2d 100. Viewing the evidence, as we must, in the light most favorable to the Government, we find that the trier-of-fact's determination must be upheld.

For the reasons hereinbefore set out, the judgment of conviction is affirmed.

Affirmed.