UNITED STATES of America,
Plaintiff-Appellee,

v.

Thomas E. JOYCE et al., Defendants-Appellants.

Nos. 73–1014 to 73–1016.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 21, 1974.

Decided May 9, 1974.

As Amended on Denial of Rehearing in
Nos. 73–1014, 73–1016 May 28, 1974.

Rehearing Denied in No. 73–1015
June 4, 1974.

Herman R. Tavins, Gerald M. Werksman, Richard J. Horka, Anna R. Lavin, Burton Sherre, Chicago, Ill., for defendants-appellants.

James R. Thompson, U. S. Atty., Arnold Kanter, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, Chief Judge, HASTINGS, Senior Circuit Judge, and CUMMINGS, Circuit Judge.

CUMMINGS, Circuit Judge.

A 15-count mail fraud indictment was returned against defendants Joyce, Sherre, Wallace and Robert L. Ostrander. Ostrander pled guilty to count 14, but this count was dismissed as to the other three defendants. Joyce was convicted under counts 1, 8, 9, 10, 11, 13 and 15; Sherre was convicted under counts 9, 10, 11 and 13, and Wallace was convicted under count 5.[1] The only prison terms imposed were on Joyce, who received a one-year sentence on count 1, and on Wallace, who received a one-year sentence on count 5. Fines and probationary terms were imposed upon Joyce and Sherre under the other counts. This appeal involves the validity of convictions under eight counts (counts 1, 5, 8, 9, 10, 11, 13 and 15) of the 15-count indictment.

Count 1, the lead count of the indictment, charged that the four defendants (including Ostrander) devised a scheme to defraud firms engaged in the business of placing insurance risks, denominated in the indictment as "insurance brokers and agents," certain state departments of insurance, denominated in the indictment as "state insurance agencies," and persons who were induced to purchase insurance policies from Global Surplus and Excess Limited (Global), a company organized in the Bahamas.

According to the lengthy allegations contained in count 1, defendants caused Trust No. 15385, an Illinois land trust, to be entered into between Global and the Cosmopolitan National Bank of Chicago. Thereafter, defendants represented that the trust was established to protect the United States and Canadian policyholders of Global. They also entered into an agreement giving Sherre a power of attorney to direct the trust. They conveyed certain Illinois real estate into the trust and represented that it was an asset of Global for the benefit of its policyholders. They had the Cosmopolitan National Bank circulate copies of the trust agreement to insurance brokers and agents and state insurance agencies to induce them to place and permit the placing of insurance risks with Global. They prepared letters of appraisal for the trust real estate assigning an excess value thereto, and they caused the letters of appraisal to be circulated to insurance brokers and agents and state insurance agencies in order to induce them to use and permit use of Global. They also omitted to advise the insurance brokers and agents and state insurance agencies that some of the trust real estate was heavily mortgaged. They formed an Illinois corporation known as

---

1. As explained *infra*, the district court granted post-trial motions of acquittal as to some of the other counts.

Global Surplus and Excess Limited of Illinois and represented that it was a holding company for the trust real estate. They were charged with making the following false representations in financial statements of Global:

1. The stock of Global Surplus and Excess Limited of Illinois was an asset of Global and had a value of $770,000.

2. Four vacant lots owned by Global in Kenosha County, Wisconsin, had a value of $60,000.

3. 41,250 shares of stock in Howard Savings and Loan Association of Chicago were owned by Global and had a value of $175,000.

4. 1,000 shares of stock in Wor-Wid Construction Company were acquired by Global in 1966 and had a value of $200,000.

5. Fifty shares of stock in Everlast Development Company of Illinois were acquired by Global in 1966 and were worth $150,000.

The grand jury also charged that defendants circulated these false financial statements of Global to insurance brokers and agents and to state insurance agencies. Defendants allegedly converted funds deposited in the checking accounts of various banks that had been deposited for the protection of Global policyholders.

Each of the subsequent counts repeated these general allegations by reference. All fifteen counts alleged a different mailing in violation of 18 U.S.C. § 1341, the mail fraud statute.[2]

Various pre-trial motions of defendants were denied by the district court before the commencement of the jury trial. After a few trial days, the Government moved to dismiss count 2 as to all defendants and count 15 as to defendant Wallace, and the trial judge acceded. The jury found Joyce guilty on all counts (except the dismissed count 2). It found Sherre guilty on counts 7 through 15, and Wallace guilty on counts 5, 6 and 8. The district court granted Joyce's post-trial motions for acquittal as to counts 3 through 7 and 12 and 14. The court also granted Sherre's motion for acquittal on counts 7, 8, 12 and 14, and Wallace's motion for acquittal on counts 6 and 8. As noted above, Joyce is appealing his conviction on counts 1, 8, 9, 10, 11, 13 and 15; Sherre is appealing on counts 9, 10, 11, 13 and 15; and Wallace on count 5.

■ Defendants rather half-heartedly contend that the scheme was not proven because there is no showing that the misstatements of assets were made with intent to defraud rather than negligently. The magnitude of the misrepresentations is alone sufficient to support the jury's finding that they were not made negligently. Additional evidence of *scienter* is summarized *infra* at p. 21 in the discussion of Sherre's separate contention that he was simply Global's attorney and was never aware of the fraud being perpetrated by his clients.

Defendants next contend that the evidence failed to sustain the charges concerning the individual mailings. In the interests of an orderly presentation, we

2. Section 1341 of the Criminal Code provided as follows at the times of the mailings charged in the indictment:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

will take up the counts assailed in numerical sequence.

### Count 1

■ Joyce is the only defendant convicted under this count, which charged that Joyce and his co-defendants caused a letter to be mailed to Joyce from the Industrial Valley Bank & Trust Company.[3] The letter was addressed to Joyce by W. Kenneth Clark of that bank and agreed to send Joyce duplicate statements of Global's account with the bank commencing with the May 1966 statement. The Government has argued that the letter furthered the scheme because it was essential for Joyce to keep track of the balance in the account so that he and other defendants could withdraw funds from the account for their own use, although they represented that it was to be a reserve to pay losses. Since the district court found that Joyce had drawn a $2,359.65 check on the account payable to American Express, it concluded that "a reasonable mind could thus have fairly found beyond a reasonable doubt that the count letter was incident to an essential element of the conversion scheme—knowledge of the balance in the account."[4] We agree that the trier of facts could have drawn the inference that the American Express check was not drawn to pay a policyholder's claim. Whether the check paid for business or personal expenses is of no moment—either use is inconsistent with maintenance of the account as a loss reserve for policyholders.[5]

■ Conceding this *arguendo*, Joyce argues that he only requested a bank statement, and that the mailing charged was not a bank statement, but an unexpected acknowledgement of his request—a mere courtesy letter. He argues that he did not cause the mailing of the courtesy letter, and that the courtesy letter could not have furthered the scheme. However, the letter was more than a mere acknowledgment; it also informed Joyce that there would be a $1 per month fee for the service he requested. It was foreseeable that there would be a charge, and that the bank would not impose the charge without an explanation. Joyce could thus foresee that his request would cause the mailing of a letter advising him of the fee, and this is sufficient. "[O]ne 'causes' the mails to be used where he 'does an act with knowledge that the use of mails will follow in the ordinary course of business, or where such use can reasonably, be forseen, even though not actually intended * * *.'" United States v. Maze, 414 U.S. 395, 399, 94 S.Ct. 645, 648, 38 L. Ed.2d 603, quoting from Pereira v. United States, 347 U.S. 1, 9, 74 S.Ct. 358, 98 L.Ed. 435. The count letter also furthered the scheme since it was impossible for Joyce to obtain the needed bank statements without causing the mailing of the count letter.

■ As to the proof of mailing of this count letter, witness Clark testified that he dictated the letter and that his secretary's practice was to send out all dictated letters (other than interoffice correspondence) by mail. Testimony as to office practice is sufficient proof of mailing. United States v. Shavin, 287 F.2d 647, 652 (7th Cir. 1961); United States v. Silvern, 484 F.2d 879, at 884–

---

3. The indictment refers to this bank as being "of Philadelphia, Pennsylvania"; the bank officer testified that the letter was mailed from the suburban Marion, Pennsylvania, branch. Defendants do not assail this discrepancy.

4. The check payable to American Express is the only one of a series of checks drawn on the account (Govt. Ex. 116) on which both the payee and the date are legible. The district judge relied on this check because it was dated later than the count letter. We note that there are also six checks with illegible dates (but lower check numbers than the check to American Express) payable to defendants: two to Thomas Joyce, two to Burton Sherre, and two to Robert Ostrander.

5. Consequently, it is unnecessary to accept the Government's additional argument that Joyce required these bank statements in order to misrepresent the balances on deposit in that bank.

885, reheard *en banc* on other grounds, 484 F.2d 879 (7th Cir. 1973); United States v. Flaxman, 495 F.2d 344, at 349 (7th Cir. 1974). While the evidence in those cases was somewhat stronger than here, we hold that Clark's testimony was sufficient proof of mailing. Even weaker proof of mailing was held sufficient on some counts in King v. United States, 25 F.2d 242, 244 (6th Cir. 1928).

Joyce also contends that venue has not been established despite the showing that the usual procedure was to mail such a letter from Pennsylvania to the recipient at the address shown on the letter, here 7019 West Higgins Avenue, Chicago. Illinois 60656. In the normal course of the mails, we presume that a letter is sent to the address shown, so that venue was adequately established. Cf. Grannis v. Ordean, 234 U.S. 385, 397–398, 34 S.Ct. 779, 58 L.Ed. 1363; Henderson v. Carbondale Coal & Coke Co., 140 U.S. 25, 37, 11 S.Ct. 691, 35 L.Ed. 332; Marston v. Bigelow, 150 Mass. 45, 22 N.E. 71, 73 (1889).

### Count 5

Wallace is the only defendant presently convicted under count 5. That count charged defendants with the December 21, 1966, mailing of a letter to International Express Agency, Inc. in Cleveland, Ohio. The letter was from Burton Sherre to Mr. Paterson of the International Excess Agency. It stated that Wallace, Joyce and Ostrander had agreed that some of the cost of Sherre's legal services should come from Global funds held by Paterson's office. This request was refused by Paterson because the Ohio Department of Insurance had asked him to keep all Global funds in escrow. With Wallace's and Joyce's consent, Sherre was attempting to obtain for himself funds that were segregated for the benefit of policyholders' claims in Ohio. The letter thus falls within the conversion scheme alleged.

At the time this letter was sent, Wallace was still active in Global's affairs. As a member of a mail fraud scheme, Wallace was responsible for any letter which any other member of the scheme caused to be mailed in execution of the scheme. Pritchard v. United States, 386 F.2d 760, 764 (8th Cir. 1967), certiorari denied sub nom. Borchelt v. United States, 390 U.S. 1004, 88 S.Ct. 1247, 20 L.Ed.2d 104; Babson v. United States, 330 F.2d 662, 665 (9th Cir. 1964), certiorari denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1045; Sherwood v. United States, 300 F.2d 603, 605 (5th Cir. 1962), certiorari denied, 371 U.S. 838, 83 S.Ct. 65, 9 L.Ed. 2d 74; Blue v. United States, 138 F.2d 351, 358 (6th Cir. 1943), certiorari denied, 322 U.S. 736, 64 S.Ct. 1046, 88 L. Ed. 1570; Tincher v. United States, 11 F.2d 18, 21 (4th Cir. 1926), certiorari denied, 271 U.S. 664, 46 S.Ct. 475, 70 L.Ed. 1139; Silkworth v. United States, 10 F.2d 711, 717 (2d Cir. 1926), certiorari denied, 271 U.S. 664, 46 S.Ct. 475, 70 L.Ed. 1139; cf. Kann v. United States, 323 U.S. 88, 93, 65 S.Ct. 148, 89 L.Ed. 88. In its memorandum opinion of August 10, 1973, the district court stated that it had erroneously granted Joyce's motion for acquittal on count 5 since the Government had not drawn its attention to the language in the count 5 letter stating that Joyce had also agreed to Sherre's request. But under the rule just stated, each schemer was responsible for Sherre's acts in furtherance of the common scheme, whether or not he knew of or agreed to the specific mailing. We have been directed to no 7th Circuit cases applying this rule in the absence of a separate count charging conspiracy; somewhat surprisingly, the issue appears not to have arisen in this Court. But we have upheld the admissibility of hearsay declarations by persons shown to be coconspirators in cases where conspiracy was not charged. United States v. Jones, 438 F.2d 461, 466 (7th Cir. 1971); United States v. Blue, 432 F.2d 1191, 1194 (7th Cir. 1970), certiorari denied, 401 U.S. 921, 91 S.Ct. 909, 27 L.Ed.2d 824; United States v. Bernard, 287 F.2d 715, 719–721 (7th Cir. 1961), certiorari denied, 366

U.S. 961, 81 S.Ct. 1921, 6 L.Ed.2d 1253. We therefore have no hesitation in joining at least six other circuits in applying conspiracy principles to a multimember mail fraud scheme. The nature of the group activity is the same whether or not a conspiracy is charged.

## Count 8

■ Joyce is the only defendant whose conviction was left standing under count 8. This count charged that Joyce and the other defendants caused International Excess Agency of Cleveland, Ohio, to mail Joyce a copy of its letter of February 16, 1967, to Carl Brown in St. Louis, Missouri, enclosing a copy of Joyce's false statement of assets, so that Brown could secure approval for Global to do business in Missouri. This of course furthered the scheme. Perhaps recognizing that the sending of a copy of this letter to Joyce helped him keep track of who had been told what in the scheme of misrepresentations, his brief merely states that it is "inconceivable that a carbon copy of a letter to an alleged schemer could in any way have furthered the scheme charged." We find it quite conceivable.

■ Joyce is somewhat more persuasive in his contention that proof of mailing of this count letter was lacking. The Government concedes that the proof of mailing as to count 8 is "possibly the most circumstantial." The trial court granted Sherre's and Wallace's post-trial motions for acquittal on count 8, stating "the government merely proved the mailing of a letter from Cleveland to St. Louis, Missouri, which bore the notation 'cc: Mr. Thomas Joyce.' This is not a sufficient basis for a reasonable inference that a copy was mailed to Joyce." We disagree, for the witness Paterson testified that the notation meant a carbon copy was directed to Joyce, and that the customary procedure was to place such a copy in a separate pile of mail going to Joyce or Global, and then to mail the pile in one envelope. That was sufficient. United States v. Shavin, *supra*. Since the copy was sent to Joyce in Chicago, venue was present.

## Count 9

■ This count involves both Joyce and Sherre. It charges that the defendants caused the Cosmopolitan National Bank of Chicago to send a letter to E. P. Littlejohn & Company in Marshall, Texas, telling the addressee that the beneficiary of Trust No. 15385 was Global and that the party to contact under the trust was Burton Sherre at 7019 West Higgins Avenue, Chicago. Neither defendant contends that the letter was not in furtherance of the scheme. They do contend that there is no proof of mailing of this count letter. Corrinne Bek, assistant vice president of the bank and sender of the letter, testified that the signed letter was placed in an envelope and put in the "outbox going out for the mail" and that the bank's mail boys would "pick it up, * * * run it through the postage meter and then * * * bag the mail and take it to the Oak Street Post Office." Under United States v. Shavin, *supra*, this was sufficient proof of mailing. Defendants argue that there is no evidence Miss Bek testified of her own knowledge, but she purported to do so, and in the absence of some indication that she only knew what the mail boys told her, we assume she knew the procedures in her own office. We doubt that defendants seriously disagree, since Miss Bek was not cross-examined as to the source of her knowledge. Mailing can be proved by office custom without producing as a witness the person who personally placed the letter in a United States mailbox. United States v. Flaxman, *supra*.

## Counts 10 and 11

■ Both Joyce and Sherre were convicted under counts 10 and 11. These counts concern a written inquiry and a letter forwarding the inquiry and therefore will be considered together. The count 10 letter is from B. Carvalho

of the Bala-Cynwyd, Pennsylvania, company bearing his name, and is addressed to the Cosmopolitan National Bank. The letter states that Carvalho & Company, Inc. is a correspondent of Global and "its largest producer of premiums" and that it would like to know the status of Trust 15385. The count 11 letter is Miss Bek's letter to Global, attention of defendant Sherre, stating that the inquiry should receive his immediate attention. Since defendants were inducing insurance brokers to rely on this trust as a protection for policyholders, the count 10 letter was certainly foreseeable. The letter was written at a time when Carvalho was attempting to have defendant pay for losses claimed by policyholders, so that he was of course interested in the assets of the trust. Part of the trust agreement with the Cosmopolitan Bank was to forward correspondence concerning the trust to defendant Sherre. This enabled defendants to continue their misrepresentations about the trust instead of permitting the bank to divulge its true value. The jury was entitled to consider these letters as furthering the scheme.

As to proof of mailing, Carvalho testified that he or his secretary would take outgoing mail to the post office at the end of each day and that this procedure was followed with respect to the count 10 letter. He further testified that the letter, which was found in the files of the Cosmopolitan National Bank, was not hand-carried from Pennsylvania to Chicago. The proof of mailing was accordingly sufficient.

With respect to the count 11 letter, the proof of its mailing was supported by Miss Bek's testimony about office procedure described under count 9, and her testimony that she put the count 11 letter into the normal course of that procedure.

Defendants' argument that counts 10 and 11 deal with the same letter so that they cannot be separately and cumulatively punished for each count is too frivolous to require treatment under

a separate heading. The substantive offense is use of the mails, and "there is no doubt that the law may make each putting of a letter into the post office a separate offence." Badders v. United States, 240 U.S. 391, 394, 36 S.Ct. 367, 368, 60 L.Ed. 706.

## Count 13

Joyce and Sherre were convicted under this count which involved a letter from Morton Olken to defendant Ostrander. The count letter is a copy of this letter allegedly sent by Olken to Fred Pearson at 223 West Jackson Boulevard in Chicago. The letterhead was that of Atlantic Insurance Agency, Inc., Chicago, Illinois. Although Pearson testified that the letter had been opened by his mail department and stamped accordingly, he also stated that the mail department opened and stamped privately delivered letters as well as letters received through the mail. He concluded that it was possible that Olken dropped the letter off at his office. Particularly since both men's offices were in Chicago, we cannot accept the district court's view that Pearson's doubt was no greater than the possibility of error "inherent in any situation where the government seeks to prove mailing by evidence of customary procedures." Since the only witness had a reasonable doubt whether the letter was mailed, the jury had to speculate to reach its verdict. We hold that the Government did not sufficiently show that the mails had been used with respect to this communication. We need not consider defendants' additional contention that this letter did not further the scheme.

## Count 15

Joyce and Sherre were also convicted under this count, which charges defendants with causing a February 29, 1968, letter to be sent by Sherre to E. P. Littlejohn & Son in Marshall, Texas. In the count letter, Sherre stated that Global had received from Cosmopolitan a copy of an unpaid claimant's letter sent to Cosmopolitan. The original of that

letter had been sent to Littlejohn, stating, according to the count letter, that the complaining insurance broker was "quite concerned over not being paid on a claim." Sherre admonished Littlejohn that "unfortunately this type of letter [from the claimant] may perplex our bank." The letter could be deemed in furtherance of the scheme because defendants would not wish the Cosmopolitan to correspond with brokers and divulge the true value of the trust. Defendant Sherre testified that he did not hand this letter to Littlejohn but "in all probability mailed it to him." This was sufficient proof of mailing.

### Applicability of United States v. Maze.

At the oral argument, the parties discussed the impact of United States v. Maze, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603, on this case. There the Supreme Court held that the mail fraud statute was not violated where respondent had used a stolen credit card at motels that thereafter mailed the underlying sale invoices to an out-of-state bank. The Court held that the mailings were not "for the purpose of executing such scheme" (18 U.S.C. § 1341) because respondent's scheme had reached fruition when he checked out of the motels and "the mailings from the motel owners here to the Louisville bank increased the probability that the respondent would be detected and apprehended" (414 U.S. at 403 [94 S.Ct. at 650]). In contrast to *Maze*, the scheme here was to earn profits by persuading people to place insurance with the under-capitalized company. Therefore, any letter which was incident to the *running* of Global and which tended to give the impression that all was well, that risks were adequately protected, and that business was being transacted normally, was in furtherance of the scheme under prior Supreme Court cases approved in *Maze*. While inquiries to Cosmopolitan were aimed at detecting any fraud which might exist, it was necessary to permit such inquiries to persuade some victims that the trust was as

represented. Defendants were found to have arranged favorable replies to such inquiries, so that these mailings were also in furtherance of the scheme. *Maze* does not affect the foregoing analysis of the mailings involved in this appeal.

### Pre-Indictment Delays

Defendants claim that their rights under the Sixth Amendment and Rule 48(b) of the Rules of Criminal Procedure were violated by the 34-month delay between the first presentation of the case to the grand jury and the return of the indictment. However, United States v. Marion, 404 U.S. 307, 92 S. Ct. 455, 30 L.Ed.2d 468, establishes that the Sixth Amendment speedy trial provision has no application until defendants are accused, either by indictment, information, or arrest. *Marion* also decided that Rule 48(b) is limited to post-arrest situations. *Id.* at 319. Defendants claim that they were accused when the case was first presented to the grand jury. But *Marion* clearly did not consider such "targeting" an accusation which triggers the right to a speedy trial. In *Marion*, newspapers stories in October 1967 quoted the United States Attorney as saying the matter was under investigation and indictments would be forthcoming. In summer 1968, Marion delivered his company's records to the United States Attorney and was interviewed about the case. *Id.* at 309. The Court held that there was no accusation until Marion was indicted on April 21, 1970. *Id.* at 313.

The *Marion* opinion did say that the due process clause requires dismissal of an indictment if pre-indictment delays caused substantial prejudice to defendants' right to a fair trial and were an intentional device to gain tactical advantage over them. *Id.* at 324. Here the pre-indictment delays did not extend beyond the period of the applicable statute of limitations, and *Marion* clearly implies that the limitations period is the only protection against delay unless specific prejudice is shown. Two district judges, one before trial and one

after, independently examined defendants' claims of prejudice and found them insubstantial. We agree. The only specific complaint is that two witnesses died. The first, a Mr. Black, would allegedly testify that he filed Global's financial statement with the Pennsylvania Insurance Department, even though Joyce told him not to file it because it was erroneous. Since Global did business in Pennsylvania, defendants had to know that papers had been filed with the Pennsylvania Insurance Department, and they could have shown any attempts to correct Black's misstatements by cross-examining the witness from the Department. Defendants' only argument as to the second witness, John Carvalho, is that witness Paterson testified to many conversations to which Carvalho was a party. While it might have been helpful to defendants to question Carvalho, their due process rights were protected by cross-examination of Paterson. It is also significant that defendants' brief indicates that Carvalho died "around 1968," so that even if the Government had proceeded much more quickly than it did, Carvalho would probably have died before trial.

Nor is there any showing of intentional delay by the Government. The voluminous transcript and exhibits show that this scheme was a complex one that must have required a lengthy investigation. Judge Marovitz found that the first grand jury to hear the case did not indict, but designated a postal inspector to investigate further. Defendants' due process claims based on *Marion* cannot be sustained.

*Post-Indictment Delays*

■■■ Defendants also complain of the 12-month delay between their indictment and trial. The leading case in this area is Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101, where the Court held that the constitutional right to a speedy trial must be determined by weighing the conduct of the prosecution and that of the defendant in the light of four factors: "length of delay, the rea-son for the delay, the defendant's assertion of his right, and prejudice to the defendant." 407 U.S. at 530. A 12-month delay, while not insignificant, is not extreme. In *Barker*, the delay was well over five years, but other factors led the Court to find no denial of a speedy trial. In United States v. De-Tienne, 468 F.2d 151 (7th Cir. 1972), we found a 19-month delay justified.

The reasons for the delay are attributable in varying part to the defendants, the Government, the district court's docket, and the complexity of the case. Of course, more delay is tolerable in a complex case. 407 U.S. at 531. Defendants' first round of pre-trial motions, originally due July 1, 1971, were not all filed and briefed until August 23. The Government was given ten days to respond, and took thirty; defendants' reply was due five days thereafter, but was not filed for twenty days. At each step the district judge granted extensions or accepted late filings, and this appears reasonable in light of the number and complexity of the motions. The motions were finally ruled on on November 19 and the case was set for trial on January 31, 1972. At this point the Government requested a continuance, explaining that the attorneys responsible for the case were involved in lengthy trials before other judges of the district court which would persist until just before January 31. According to the docket sheet, this was its only such request. The trial was reset for March 6, and the Government's attorneys agreed to meet at night during their other trials to negotiate stipulations on technical aspects of the case. Shortly thereafter the case was reassigned to a newly appointed judge who could not try it on the day set. *Barker* indicates that delay due to reasons such as overcrowded courts should be considered against the Government, but should not be weighed very heavily. 407 U.S. at 531. The case did proceed to trial as soon as the new judge had a date available; defendants continued to file additional pre-trial motions until the eve of the June 15th trial.

Although defendants did make a timely assertion of their right to a speedy trial, they have not satisfactorily shown actual prejudice. There is no allegation of specific prejudice from post-indictment delay; defendants rely entirely on the two pre-indictment deaths and the likelihood that memories faded over the total four-year period. Because prejudice was so slight, because only part of the delay is attributable to the Government, and because there is no indication that the Government-caused delay was deliberate or due to culpable negligence, we do not consider this a close case. The right to speedy trial was not violated.

### Denial of Severance

■ Defendants insist that the district court should have granted their motion for severance because Wallace took the stand and blamed the scheme on Joyce. This is an insufficient reason to require a separate trial. United States v. Hutul, 416 F.2d 607, 620 (7th Cir. 1969), certiorari denied sub nom. Sacks v. United States, 396 U.S. 1007, 90 S.Ct. 562, 24 L.Ed.2d 499; United States v. George, 477 F.2d 508, 515 (7th Cir. 1973). Furthermore, Joyce's attorney did not bother to cross-examine Wallace to show that the jury should disbelieve his testimony. It is said that this was because Joyce himself was absent, but after Wallace's direct testimony and before his cross-examination, Joyce executed a written waiver of his right to be present, even though his hospitalization would almost certainly have justified a continuance or severance if requested. In any event, if Joyce had been severed and Wallace's trial completed, Wallace's testimony would have been available to the Government at Joyce's second trial.

■ Finally, it is no justification for severance that Joyce and Sherre wanted a bench trial, while Wallace insisted on a jury trial. There is no right to a bench trial (Singer v. United States, 380 U.S. 24, 85 S.Ct. 783, 13 L. Ed.2d 630), and avoidance of duplicate two-week trials is certainly a legitimate reason for withholding consent to the proffered jury waiver. We conclude that Joyce has not shown sufficient prejudice to justify reversal.

### Sufficiency of Evidence as to Sherre

■ Sherre attempts to void his conviction by claiming a lack of knowledge during his association with Global. The evidence refutes this claim. Sherre was centrally involved in the scheme, since he handled most of the correspondence from Global's Chicago office. It would be extraordinary if he never learned what was going on. This does not mean he can be convicted by association, but it does increase the significance of any evidence tending to show his actual knowledge of the scheme's nature.

According to the credited testimony, Sherre was first involved in this scheme in May 1965. On May 26, he was at a meeting with Joyce, Ostrander and Wallace and a Mrs. Chambers. Joyce told the others that he would place certain property, which he described to the group as worth more than $750,000, into the trust fund at Cosmopolitan. In Sherre's presence, he then dictated a letter describing the trust property as worth $1,180,000. In the presence of Sherre and the others, Mrs. Chambers typed the letter and signed the name Raymond Kusniar to it.

A Mrs. Lewis testified that in November 1965, she met with Sherre, Joyce and Ostrander. She warned all three that they were under government scrutiny and that there was particular concern about the land trust. She also complained about not being paid, and in Sherre's presence, Joyce told her that Global was insolvent. She responded that there had been "several occasions" when it had enough money to pay her.

Sherre had the power of direction over the trust at Cosmopolitan. As an attorney, he must have known that Cosmopolitan, as trustee of an Illinois land trust, was completely subject to his directions on behalf of Global, and had no independent power to protect the pol-

icyholders. Sherre wrote the count 15 letter, urging brokers not to correspond directly with Cosmopolitan, which indicates he was aware that Cosmopolitan would not support Global's representations.

The evidence concerning Sherre's involvement justified the jury's conclusion that he participated in the common plan to defraud with the requisite criminal intent.

## Evidentiary Rulings

■ Defendants protest that appraisal evidence should not have been received because the Government inadvertently failed to disclose the appraisals to defense counsel. Rule 16(g) of the Federal Rules of Criminal Procedure offers a district judge four sanctions for a violation of the Government's duty to disclose. Here the judge chose one of the alternatives, namely, a continuance as to the appraisal witness, to give defendants time to prepare for cross-examination. Defendants declined the continuance. Therefore, there was no error in receiving the appraisal testimony.

■ Asserting a hearsay objection, defendants complain that witness Minner, the chief of the Surplus Lines Division for the Pennsylvania Insurance Department, was permitted to read from Government Exhibit 145, in which the Royal Bank of Canada advised the Pennsylvania Insurance Department that Global no longer had any account with that bank. Since none of defense counsel objected to the receipt of Exhibit 145 in evidence, it was accordingly received. Once the exhibit was in evidence and could go to the jury, it can not have been error to allow Minner to read from it. Furthermore, the hearsay objection was not made below. Defendants' only complaint was that the reading of the exhibit on redirect was outside the scope of cross-examination.

■ Defendants also assail the testimony of Mrs. Lewis discussed *supra* at p. 21. Such testimony bore on *scienter* and therefore was properly admitted.

■ Finally, it is complained that witness Paterson was permitted to testify that in addition to $2500, his company "lost a great deal else in the way of reputation." Since the mail fraud statute covers "any scheme or artifice to defraud, *or* for obtaining money or property" (note 2, *supra*; emphasis added), the Government did not have to confine its proof to monetary loss. Cf. United States v. Rowe, 56 F.2d 747, 749 (2d Cir. 1932).

## Instructions to Jury

■■ First of all, defendants complain of Government Instruction No. G–31 which defined "scheme to defraud" and was substantially the same as La-Buy Jury Instruction 16.02, 36 F.R.D. 601. The last sentence reads "It is essential only that one or more of them [pretenses, representations and acts charged in the indictment] be proved to show the existence of the scheme." Defendants suggest that this is erroneous because it would permit the jury to convict where only part of a scheme was proved. On the contrary, it is well established that every allegation of an indictment charging a scheme need not be proved in order to convict. Schaefer v. United States, 265 F.2d 750, 753 (8th Cir. 1959), certiorari denied, 361 U.S. 844, 80 S.Ct. 97, 4 L.Ed.2d 82; Myrick v. United States, 332 F.2d 279, 281 (5th Cir. 1963), certiorari denied sub nom. Bergman v. United States, 377 U.S. 952, 84 S.Ct. 1630, 12 L.Ed.2d 497. We would prefer that the instruction be modified in the future to track more closely the cases cited, so as to avoid any possible implication that the jury must find a scheme if it finds that any one allegation of the indictment is proved. The *Schaefer* version of this instruction avoids that ambiguity by providing that the government must "prove one or more or a sufficient number of the representations to indicate and show that the scheme alleged was actually set up * * *." 265 F.2d at 753. While such a variation of the LaBuy instruction would be more appropriate, the chance

that the instruction given was misunderstood is not great enough to rise to the level of reversible error. Moreover, no objection was made to the instruction, as required by Rule 30 of the Federal Rules of Criminal Procedure, so that any error in this regard was waived. United States v. Zweig, 467 F.2d 1217, 1222 (7th Cir. 1972), certiorari denied, 409 U.S. 1111, 93 S.Ct. 921, 34 L.Ed.2d 692.

██ Defendants also object to the court's use of the following sentence from LaBuy Instruction 4.05 (33 F.R.D. 553):

> "No person can intentionally avoid knowledge by closing his eyes to facts which should prompt him to investigate."

We adhere to United States v. Grizaffi, 471 F.2d 69, 75 (7th Cir. 1972), certiorari denied, 411 U.S. 964, 93 S.Ct. 2142, 36 L.Ed.2d 684, upholding the propriety of this instruction. See also United States v. Squires, 440 F.2d 859, 864 (2d Cir. 1971).

██ Defendants assail one sentence from the court's charge with respect to reasonable doubt [6] but ignore other instructions concerning reasonable doubt that were also given.[7] Defendants assert too that the portion of the reasonable doubt charge quoted in note 6 is contradicted by a later portion of the charge concerning evidence of good character.[8] In our judgment, these instructions taken together were not so confusing or contradictory as to prejudice the defendants. We think the jury properly understood these later instructions to modify, rather than contradict, the instruction in note 6. But that instruction would be better worded if it avoided the troublesome phrase "sufficient legal evidence" and simply told the jury that it must convict if persuaded of guilt beyond a reasonable doubt.

██ The majority concurs in Part III of Chief Judge Swygert's dissent. The views there expressed apply with equal force to counts 5 and 8. The difference between us is only that we do not believe the jury's verdict on those counts is unsupportable as a matter of law.

For the foregoing reasons, the judgments are affirmed except that Joyce's and Sherre's convictions under count 13 are reversed.

SWYGERT, Chief Judge (dissenting in part).

I respectfully dissent in part. I cannot agree with the majority that there was sufficient evidence to support a conviction of Wallace on Count 5 and Joyce on Count 8, and accordingly I would reverse the convictions on these counts.

I

Count 5, briefly restated, charged all four defendants with the mailing of a letter to Tom Paterson of International Excess Agency, Inc., Cleveland, Ohio from codefendant Burton Sherre. In his letter, Sherre represented that codefendants Wallace, Joyce, and Ostrander agreed that "some of the cost" of Sherre's legal fees for settling claims should come from Global funds held by

---

6. The sentence in question provides:
   "Indeed the law requires a conviction where there is sufficient legal evidence to show the defendant is guilty beyond a reasonable doubt."

7. For example, defendant's Instruction No. 15 provided:
   "You cannot find any defendant guilty unless you believe beyond a reasonable doubt that he acted with the requisite intent. Evidence of a defendant's relationship with Global Surplus and Excess Ltd. and his stake or lack of one in the financial success of that enterprise may be considered on the issue of intent. If you believe that a defendant lacked the requisite intent, then, as I indicated, it is your duty to find him not guilty."
   A similar instruction was given on good character (note 8, *infra*), and on good faith.

8. The supposedly contradictory sentence provides:
   "The circumstances may be such in a particular case that evidence of good character may alone create a reasonable doubt of defendant's guilt, although without it the other evidence would be convincing."

International. The sum of $1,000 was specified. Sherre was found not guilty on this count by the jury, and the trial judge granted Joyce's post-trial motion for judgment of acquittal. Thus Wallace is the only defendant who now stands convicted under Count 5.

The majority has affirmed Wallace's conviction upon a finding of the following: Wallace was active in the affairs of Global at the time the letter was sent; the count letter falls within the conversion scheme; and Wallace was responsible for any letter which any other member of the scheme caused to be mailed in execution of the scheme.

I am unpersuaded that the count letter falls within the conversion scheme. The scheme as outlined in the indictment alleges that Global Surplus and Excess had represented that defendant held out inflated and non-existent assets to insurance brokers and state insurance agencies. The scheme was not use of the mails to defraud by settling claims and seeking payment from retained premiums to pay legal counsel. The letter upon which the conviction under Count 5 is based is solely an effort by Sherre to secure compensation for legal services rendered in effecting settlement of claims.

Assuming, *arguendo*, that the count letter can be said to fall within the conversion scheme, I cannot agree that the Government proved Wallace was in any way responsible for the letter. That letter, written by Sherre, merely indicates that Wallace along with the other codefendants, agreed to Sherre's request made to Paterson. Conspicuous by its absence from the record, however, is any evidence of the following: that Wallace and the other codefendants had in fact agreed on how Sherre should be compensated for his services; that Wallace knew of the letter or of its mailing; that Wallace asked Sherre to send the letter; or that Wallace in any way ratified Sherre's letter. Reliance upon the language in the letter without more is insufficient to support a finding of authorization or ratification by Wallace for the mailing of the letter.

I also harbor doubt as to how active Wallace was in the affairs of Global at the time the letter was sent since the record is replete with evidence that Wallace at the time was estranged from his codefendants.

## II

I am additionally disposed to disagree with the majority in their affirmance of Joyce's conviction on Count 8. That count charged defendants with causing International to send Joyce a copy of its letter to Carl Brown of Royal Excess Underwriters, St. Louis. The count letter informed its recipient that a financial statement of Global was enclosed with the consent of Joyce. Joyce is the only defendant who now stands convicted under this count. His codefendants were acquitted on the count on the basis of their post-trial motions.

Setting aside the question of whether the letter can be construed as a part of the scheme alleged in the indictment, I find the record will not support a conclusion that there was sufficient evidence to establish proof of mailing a copy of the letter to Joyce or his receipt of it. The concession by the Government, "that the proof of mailing as to Count 8 is probably the most circumstantial" is close to demonstrating the vulnerability of the proof of mailing.

The Government unsuccessfully attempted to establish proof of mailing through the testimony of Tom Paterson who directed a subordinate to draft the letter and enclose a financial statement of Global. While Paterson testified to the customary procedures for mailing letters and copies in his office, it is significant that he did not personally prepare the letter and that he did not know whether he was in his office on the date shown on the letter. In this posture, Paterson could not say that a copy of the letter was ever mailed or received by Joyce in Chicago. No other testimony was offered by the Government to estab-

lish proof of mailing. The notation in the count letter "cc: Mr. Thomas Joyce" standing by itself is an insufficient basis from which to conclude that a copy was mailed to Joyce. Accordingly, the conclusion is inevitable that even when the evidence is viewed in a light most favorable to the Government, the record will not support a reasonable inference that a copy of the letter was sent to Joyce.

After the notice of appeal had been filed in this court, we remanded to the district court for the limited purpose of disposing of certain post-trial motions filed by Joyce. On remand a motion for judgment of acquittal on Counts 3 through 7 and 12 and 14 (on which Joyce had been found guilty) was granted. The district court denied the motion as to Count 8.

Later, Joyce's codefendants secured a similar remand to the district court. The motion for acquittal on Count 8 was granted to Joyce's codefendants Sherre and Wallace. In ordering acquittal, the district judge stated:

> Count 8 alleges that defendants caused a letter to be mailed from Cleveland, Ohio, to defendant Joyce in this district. No such letter was ever offered in evidence. Instead, the government merely proved the mailing of a letter from Cleveland to St. Louis, Missouri, which bore the notation "cc: Mr. Thomas Joyce." This is not a sufficient basis for a reasonable inference that a copy was mailed to Joyce. Without such an inference, a reasonable mind could not fairly conclude that the evidence showed the essential element of mailing beyond a reasonable doubt.

Afterward, Joyce asked for equal treatment. His request was denied, the judge reasoning that the district court had lost jurisdiction over Joyce because the limited remand as to him had terminated when his post-motions had been acted upon. This recitation of facts clearly demonstrates the unfairness to this defendant through an affirmance of Count 8.

Moreover, since the record is barren of any evidence to establish that Joyce ever received a copy of the letter in Chicago, it must be concluded that proper venue has not been established.

### III

Although I do not dissent from the affirmance of the convictions under Counts 1, 10, and 11, I am troubled by them.

In my opinion, the Government has stretched to the breaking point the mail fraud statute by using as the count letter in Count 1 the acknowledgment from W. Kenneth Clark of the Industrial Valley Bank and Trust Company, Philadelphia, of Joyce's request for a monthly bank statement of the Global account. The acknowledgment letter was only tangentially related to the fraudulent scheme. I believe the intent of the statute would be better served by using mailings that have something more than a strained relation to the scheme, and not a miscellaneous, random piece of correspondence that requires tortuous reasoning on the Government's part to sustain the conviction.

The foregoing observation is equally applicable to Counts 10 and 11 where the count letter in Count 10 becomes the underlying basis for Count 11 since the latter count dealt with merely a forwarding of a photostatic copy of the Count 10 letter from the original addressee, Cosmopolitan National Bank, to Global. If the copy of the original letter had been forwarded several times through the mail, presumably the Government would have been able to indict for each separate mailing. It seems to me the prosecutor has a responsibility to exercise restraint and should not approve indictments on essentially irrelevant or duplicative mailings in order to increase the number of counts.

### ORDER

Wallace's petition for rehearing asserts that he must be acquitted on Count 5 since the jury acquitted code-

fendant Sherre and since the district court "erroneously" acquitted codefendant Joyce on that count ·(see p. 16). His claim is wide of the mark, for Count 5 is a substantive count, making inapplicable the federal rule that a jury may not convict one defendant ·of conspiracy and acquit his alleged conspirators.

When, as here, the jury found a scheme to defraud and that Wallace, Sherre and Joyce joined it,* any inconsistency in its verdict as to one of the substantive crimes in furtherance of the scheme is governed by Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356. Furthermore, this point was not previously raised and comes too late.

The petition for rehearing is denied.

SWYGERT, Chief Judge, voted to grant the petition for rehearing.

---

* Sherre remains convicted on·Counts 9, 10, 11 and 15 and Joyce on Counts 1, 8, 9, 10, 11 and 15.