UNITED STATES of America, Appellee,

v.

Paul DeFIORE, Joseph Coppola and Robert Galler, Defendants-Appellants.

Nos. 1206, 1319 and 1332, Dockets 82-1447, 83-1014 and 83-1025.

United States Court of Appeals, Second Circuit.

Argued July 11, 1983.

Decided Nov. 2, 1983.

Certiorari Denied March 26, 1984. See 104 S.Ct. 1684.

---

volved secretly transporting cigarettes from North Carolina to New York on which no New York cigarette taxes had been paid, and thereafter selling them in New York. Ten telephone calls, corresponding to the ten counts charged in the indictment, allegedly brought the scheme within the federal wire fraud statute, 18 U.S.C. § 1343 (1976).[1] Defendants DeFiore and Galler were convicted on all ten counts, defendant Coppola on all but counts five and eight.

Defendant DeFiore advances essentially five arguments in support of his appeal. He first argues that the wire fraud statute was not intended for the prosecution of schemes designated to violate state tax laws. Assuming the applicability of the wire fraud statute here, DeFiore's second contention is that the evidence offered at trial to prove either a scheme to defraud or use of the wires was insufficient.

The balance of DeFiore's arguments are all addressed to an assortment of alleged trial defects which, he contends, require reversal: (1) a purportedly erroneous supplemental charge by the trial court in response to a jury question, (2) the admission into evidence of prior similar acts by DeFiore predating the commencement of the statute of limitations, and (3) prosecutorial misconduct in the form of leading questions to government witnesses and prejudicial summation.

Defendant Coppola raises two arguments on his appeal. First, he submits, the government failed to adduce sufficient evidence of his knowing participation in the fraudulent scheme. Coppola further contends that voir dire of prospective jurors by the United States magistrate, even though conducted pursuant to local court rule, was

Edgar Paul Boyko, San Diego, Cal. (Miller, Boyko & Bell, San Diego, Cal., and Albert J. Brackley, Brooklyn, N.Y., on the brief), for defendant-appellant DeFiore.

Phylis Skloot Bamberger, Legal Aid Society, Public Defender Services Unit, New York City, for defendant-appellant Coppola.

Max Sayah, Asst. U.S. Atty., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., and Mary McGowan Davis, Asst. U.S. Atty., Brooklyn, N.Y., on the brief), for appellee.

Before NEWMAN and WINTER, Circuit Judges, and MALETZ, Senior Judge.*

MALETZ, Senior Judge:

Defendants-appellants Paul DeFiore, Joseph Coppola and Robert Galler were convicted under a ten count indictment which alleged a scheme to defraud the Department of Taxation and Finance, State of New York, and the Finance Department, City of New York, of substantial cigarette tax revenues. The scheme allegedly in-

---

* Of the United States Court of International Trade, sitting by designation.

1. 18 U.S.C. § 1343 provides:

    Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pic-

tures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

Defendants were also indicted under 18 U.S.C. § 2 which provides in part:

    Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

violative of the Magistrates Act, 28 U.S.C. § 636, and Article III of the Constitution.

Defendant Galler has filed no briefs, but by letter of counsel has adopted the points raised by his co-defendants.

For the reasons that follow, we reverse the convictions of defendants DeFiore and Galler on counts five and eight of the indictment. In all other respects, the judgments of conviction are affirmed.

## I

### Background

The scheme to defraud was fairly simple in nature. As testified to by John Cox, the president of Piedmont Wholesale Company (Piedmont), a North Carolina wholesale distributor of cigarettes, Piedmont was authorized to affix only North Carolina tax stamps on cigarettes. Nevertheless, in 1974 Cox and DeFiore struck a deal whereby DeFiore and Galler would place telephone orders with Cox for cigarettes to be transported to New York but which were untaxed under New York law. At that time the North Carolina tax on cigarettes was two cents per pack compared to the New York tax of 23 cents per pack. The cost to defendants was slightly higher than the price of cigarettes generally charged by Piedmont, but less than the price of cigarettes in New York. In this way the parties to the scheme would be able to realize a mutual profit.

Initially, DeFiore carried cash—in the range of $20,000—to North Carolina from New York to pay for the cigarettes. Shortly thereafter, at DeFiore's suggestion, Cox opened a bank account at First National City Bank in Brooklyn in the name of Piedmont in order to eliminate the inconvenience of transporting large sums of cash to North Carolina. Two employees of that bank testified that DeFiore made weekly cash deposits to the Piedmont account. Using the bank's customer service number, Cox would verify that a deposit had in fact been made to that account. Telephone toll records of Piedmont reflecting the dates of long-distance calls to the bank coincided with the dates of DeFiore's large cash deposits.

Both DeFiore and Galler ordered cigarettes from Cox. After confirming DeFiore's deposit to Piedmont's account Cox would release the cigarettes. Some packs of cigarettes which Cox sold bore North Carolina stamps, but others bore no stamps whatsoever. Cox testified that as for this latter group, the tax stamps were destroyed, although the North Carolina taxing authorities had been paid the two-cent-per-pack tax. The orders were packed at the Piedmont warehouse in High Point, North Carolina, ten packs of cigarettes to a carton, thirty cartons to a case. Each case was constructed of plain brown cardboard sealed with brown tape, marked only by numbers. There were no distinguishing marks on the cases to indicate to the casual observer that they contained cigarettes. Once packed, the cases of cigarettes were moved from High Point to a barn owned by a Piedmont employee, Howard Sechrest, for subsequent loading and shipment. These loading and shipment operations were not in the normal course of Piedmont's business.

As part of the arrangement between Cox and DeFiore, Cox purchased two vans and a truck. The latter vehicle was ostensibly designed to carry four-inch diameter pipe, but had been specially designed to secretly transport cases of cigarettes. The truck, bearing the marking "Tri-State Plumbing" on the cab door, had a removable side panel which concealed an interior compartment. This truck had been registered to several different persons, including Galler, and was last registered in New Jersey under the name of Tri-State Plumbing Company. The vehicle's certificate of ownership was signed by Joseph Coppola on behalf of Tri-State. A certificate of doing business issued by the State of New Jersey to Tri-State Plumbing Supply Company was also signed by Coppola in the capacity of owner. As it turned out, Tri-State's New Jersey business address on the latter certificate was fictitious.

Once loaded at Sechrest's barn the trucks would be driven to New York. Testimony

was adduced that the trucks were unloaded at a warehouse in Brooklyn, and that Galler assisted in the unloading. An agent of the Bureau of Alcohol, Tobacco and Firearms testified that on April 4, 1978 he observed the pipe truck leave the Brooklyn warehouse and cross the Verrazzano Narrows Bridge. On April 6 he observed Coppola driving the truck into the warehouse.

Other evidence of Coppola's involvement shows that on one occasion a Piedmont employee, Wayne Sexton, drove the pipe truck loaded with cigarettes to a truck stop in Warrington, Virginia, where he switched vehicles with Coppola. Sechrest testified that defendant Coppola was present when the pipe truck was loaded at his barn. Coppola was further identified by Sechrest as one of the drivers who picked up cigarettes. The government produced receipts signed by Coppola evidencing that he had stayed at a motel in North Carolina on six occasions in 1978.

Finally, a government witness testified that during 1978 he regularly purchased cartons of cigarettes without New York tax stamps from Galler.

With this background we first consider DeFiore's contention that the federal wire fraud statute may not be utilized to prosecute schemes to defraud a state of taxes due it.

## II

### The Applicability of the Wire Fraud Statute

DeFiore's argument that section 1343 was not intended to cover the fact situation alleged in the indictment is twofold in nature. First, he submits, the wire fraud statute should not apply to schemes to defraud federal or state governments of taxes due them. As a corollary DeFiore adds that the indictment here is a thinly veiled effort to prosecute as a federal offense acts which clearly are a violation of state law.

We find no room for agreement with DeFiore. Indeed, four circuits before us have squarely applied the federal fraud statutes to state tax law violations. *See United States v. Melvin,* 544 F.2d 767 (5th Cir.1977) (mail fraud in connection with interstate sale of cigarettes); *United States v. Brewer,* 528 F.2d 492 (4th Cir.1975) (same); *United States v. Mirabile,* 503 F.2d 1065 (8th Cir.1974) (mail fraud in connection with false state tax return), *cert. denied,* 420 U.S. 973, 95 S.Ct. 1395, 43 L.Ed.2d 653 (1975); *and United States v. Flaxman,* 495 F.2d 344, 349 (7th Cir.) ("Just because the State ... was the victim and makes such a scheme illegal does not preclude the Federal Government from prosecuting the perpetrators under ... federal law"), *cert. denied,* 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306 (1974). Moreover, *United States v. Henderson,* 386 F.Supp. 1048 (S.D. N.Y.1974), upon which defendant places great reliance, involved the use of section 1343 in connection with a *federal* income tax fraud prosecution. *Cf. United States v. Miller,* 545 F.2d 1204, 1216 n. 17 (9th Cir. 1976) (*Henderson* rejected in the context of federal tax violations), *cert. denied,* 430 U.S. 930, 97 S.Ct. 1549, 51 L.Ed.2d 774 (1977).

Section 1343 on its face is not limited in the manner suggested by DeFiore, nor does it purport to exempt the conduct in which he engaged. It plainly applies to "*any* scheme or artifice to defraud" in which the jurisdictional means—the wires—are employed. Its focus is upon the misuse of the wires, not the regulation of state affairs. Congress clearly has the authority to regulate such misuse.[2] *See Brewer,* 528 F.2d at

---

**2.** When Congress enacted the Jenkins Act, 15 U.S.C. §§ 375–378 (1976)—which requires cigarette distributors to file reports to appropriate state authorities—it voiced no objection to prosecutions under the wire or mail fraud statutes in connection with state cigarette tax evasion. *See* S.Rep. No. 1147, 84th Cong., 1st Sess. (1955), *reprinted in* 1955 U.S.Code Cong. & Ad.News 2883–85.

Nor did Congress voice such objection in 1978 when it passed 18 U.S.C. §§ 2341–2346 (Supp. IV 1980), entitled "Trafficking in Contraband Cigarettes". *See* S.Rep. No. 962, 95th Cong., 2d Sess. (1978), *and* H.R.Rep. No. 1629, 95th Cong., 2d Sess. (1978), *reprinted in* 1978

495; *Mirabile,* 503 F.2d at 1067. In short, principles of federalism do not provide a basis for reversal. *See also United States v. Corey,* 566 F.2d 429, 430–31 & n. 2 (2d Cir.1977) (defendant's claim of improper federal jurisdiction over what is essentially a state offense is "wholly without merit" and "frivolous").

### III

#### *Sufficiency of the Evidence*

■ We turn next to a consideration of DeFiore's and Coppola's claim that the evidence was insufficient to convict them as a matter of law. A defendant advancing a claim based on insufficiency of the evidence bears a very heavy burden. *See, e.g., United States v. Carson,* 702 F.2d 351, 361 (2d Cir.1983); *United States v. Losada,* 674 F.2d 167, 173 (2d Cir.), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). Our inquiry is

> whether the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt.... In making this determination, we must view the evidence in the light most favorable to the government, ... and construe all permissible inferences in its favor, ...

*Carson,* 702 F.2d at 361 (citations omitted).

Applying this standard of review to the facts in this case we are left with the firm conviction that, with the exception of counts five and eight of the indictment, the government presented sufficient evidence upon which a reasonable jury could find the existence of a scheme to defraud and use of the wires in furtherance thereof beyond a reasonable doubt as to all three defendants.

### A

#### *The Evidence Against DeFiore*

■ Based on the entire record presented here, in particular the telling testimony of

Cox describing the raison d'etre for the Brooklyn bank account, the specially designed pipe truck with the false compartment, and the destruction of the North Carolina tax stamps at the time cigarettes were sold to DeFiore, coupled with other testimony showing that untaxed cigarettes were unloaded and sold in New York City, DeFiore's claim of insufficiency as to the scheme to defraud is untenable. *See, e.g., United States v. Von Barta,* 635 F.2d 999, 1005–06 n. 14 (2d Cir.1980) ("Government need not show that the scheme's victims were in fact defrauded ... [only] that some actual harm or injury was at least contemplated"), *cert. denied,* 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981); *United States v. Curtis,* 537 F.2d 1091, 1095 (10th Cir.) ("it is not necessary to show that any person was in fact defrauded"), *cert. denied,* 429 U.S. 962, 97 S.Ct. 389, 50 L.Ed.2d 330 (1976); *United States v. Reicin,* 497 F.2d 563 (7th Cir.), *cert. denied,* 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974). *See also United States v. Tramunti,* 500 F.2d 1334, 1338 (2d Cir.) ("the evidence ... must be viewed in light of the totality of the Government's case, since one fact may gain color from others"), *cert. denied,* 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974).

DeFiore's contention that the government failed to prove the content of the telephone calls by sufficient evidence must fail. Given the devastating testimony of Cox that he called the bank regularly to verify that DeFiore had made the cash deposits, together with the telephone toll records, bank deposit slips, and testimony of bank tellers who took DeFiore's deposits, a strong link was established between the scheme to defraud and the eight transmissions by wire from North Carolina to Brooklyn. There was thus proof sufficient to convict on these eight counts.

U.S.Code Cong. & Ad.News 5518–35. In fact, Congress expressed no preference for which federal laws should be employed to curb the bootlegging of cigarettes. Congress did make it clear, however, that by passage of this statute it was increasing the avenues available to

federal law enforcement personnel by which they could counteract the rapidly growing illegal cigarette trade. *Id. See also United States v. Melvin,* 544 F.2d 767, 774 & n. 14 (5th Cir. 1977); *United States v. Brewer,* 528 F.2d 492 (4th Cir.1975).

We find baseless DeFiore's argument that the government failed in its proof simply because Cox could not recall the specific content of individual telephone calls made four to five years prior to trial. While it is true that the government has the burden of proving the contents of the telephone calls, proof of that may be established by circumstantial evidence. *See, e.g., United States v. Garner,* 663 F.2d 834, 838 (9th Cir.1981). And it is clear from the evidence that the government met its burden of proving that the calls from Piedmont to Brooklyn were "for the purpose of" committing wire fraud. *See United States v. Tramunti,* 500 F.2d at 1338. For Cox testified that he clearly remembered telephoning Brooklyn regularly to verify whether deposits had been made to the Piedmont account. In our view, this testimony, when juxtaposed with the dates of DeFiore's bank deposits and the dates of long-distance calls to Brooklyn from Piedmont, leads to the inescapable inference that Cox telephoned Brooklyn on the eight occasions listed in the indictment in order to verify DeFiore's deposits to Piedmont's account.

In sum, the eight telephone transmissions from Piedmont to New York bore a sufficient connection to the realization of the scheme to be considered as made for the purpose of executing the scheme, *United States v. Pollack,* 534 F.2d 964, 971 (D.C. Cir.), *cert. denied,* 429 U.S. 924, 97 S.Ct. 324, 50 L.Ed.2d 292 (1976), and to support conviction on separate counts. *Id.* at 971–72; *Melvin,* 544 F.2d at 770–77 & n. 5. The jury could permissibly infer from the telephone and bank records and from Cox' total testimony that the calls from Piedmont to New York listed in the indictment were made to verify the bank deposits.

By contrast, we agree with DeFiore's contention insofar as counts five and eight of the indictment are concerned. Those two counts are based on collect calls from a telephone number in Garden City, New York to Piedmont. However, no nexus was shown between those two calls and the scheme to defraud. In fact, there was no evidence linking those calls to any of the defendants, either in connection with verifying a deposit to Piedmont's Brooklyn bank account or with placing a cigarette order. Indeed, it was not even shown that the telephone number in question was listed in any of defendants' names. Accordingly, the convictions of DeFiore and Galler on counts five and eight of the indictment are reversed.

B

*The Evidence Against Coppola*

The proof of Coppola's knowing participation in the illicit scheme is also sufficient to sustain his conviction. His basic contention is that inasmuch as the cigarettes were packaged in plain brown cardboard cartons he cannot be charged with knowledge that he was transporting untaxed cigarettes.

On this record we find ample evidence from which a jury could reasonably infer that Coppola was aware of the nature of the goods concealed within the truck. For one thing, Coppola was present when the pipe truck was loaded in North Carolina with cigarettes into the secret compartment. He was seen driving the pipe truck on April 6, 1978. Moreover, he continued to drive to North Carolina after that date, as evidenced by six signed motel registrations dated from April 25, 1978 to October 30, 1978. Further, Coppola was the registered owner of two Tri-State Plumbing trucks, one of which was the bogus pipe truck, and was also the registered owner of Tri-State Plumbing Company.

To be an aider and abettor under 18 U.S.C. § 2, it was not necessary that Coppola know all the details of the criminal venture to be considered a participant in its criminal purpose, *cf. United States v. Garguilo,* 310 F.2d 249, 253 (2d Cir.1962). For on the basis of the evidence detailed above, a jury was entitled to infer that Coppola, frequently the driver of the truck with the concealed compartment, would have known its contents and had knowledge of the criminal venture when he signed the vehicle registration and the certificate of doing business for Tri-State Plumbing. Thus, it is

clear that Coppola satisfies the requirements this court has established for the offense of aiding and abetting: " 'that he in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.' " *United States v. Bommarito,* 524 F.2d 140, 145 (2d Cir.1975) (quoting *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir.1938)).

We turn next to DeFiore's claim of trial errors.

## IV

### *The Alleged Trial Defects*

DeFiore assigns as reversible error a supplemental charge given in response to a jury question, the admission into evidence of similar acts predating the statute of limitations, the use of leading questions by the Assistant United States Attorney during his direct examination, and prejudicial summation.

■ In the supplemental charge the trial judge further defined the wire fraud law. The only objection to it was that the judge did not fully explain how that charge related to the ten counts of the indictment—which he then immediately did. In none of this do we see any error, much less plain error.

■ DeFiore's second alleged trial error is equally without merit. He contends that it was improper for the trial court to permit the introduction into evidence of acts and transactions prior to the five-year statute of limitations period. This contention is easily disposed of. Rule 404(b) of the Federal Rules of Evidence provides:

(b) *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

Clearly, the prior act evidence adduced here went directly to establishing DeFiore's intent, as well as the preparations and plans that went into the scheme to defraud, *see Corey,* 566 F.2d at 431 & n. 4, and such evidence is admissible even though it antedates the limitations period. *United States v. Ashdown,* 509 F.2d 793, 798 (5th Cir.), *cert. denied,* 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 47 (1975); *United States v. Blosser,* 440 F.2d 697, 699 (10th Cir.1971).

■ DeFiore's final contention regarding prosecutorial misconduct is likewise unavailing. Fed.R.Evid. 611(c) states that "[l]eading questions *should not* be used on the direct examination of a witness except as may be necessary to develop his testimony." (Emphasis added). These are words of suggestion, not command. In addition, as indicated in the Advisory Committee's Note to this rule, "[a]n almost total unwillingness to reverse for infractions has been manifested by appellate courts." As for allegedly prejudicial summation by the government attorney, the absence of a contemporaneous objection or even a request for a cautionary instruction obviates our need for considering DeFiore's bare claim of prejudice. *See Malley v. Manson,* 547 F.2d 25, 28 (2d Cir.1976), *cert. denied,* 430 U.S. 918, 97 S.Ct. 1335, 51 L.Ed.2d 598 (1977).

## V

### *Jury Voir Dire by the Magistrate*

■ We address finally Coppola's argument that the voir dire of prospective jurors in this case was improperly delegated to the federal magistrate contrary to 28 U.S.C. § 636 (1976) and Article III of the Constitution. Local court rule 25 of the Eastern District of New York authorizes magistrates to conduct voir dire of petit jurors. Coppola argues, however, that the delegation of certain duties to a magistrate in felony cases extends only to pretrial matters under the Magistrates Act, and that the selection of a jury is not a pretrial matter. *See The Virgin Islands v. George,* 680 F.2d 13, 15 (3d Cir.1982).

However, no contemporaneous objection was made to the jury selection process. We, therefore, see no reason to consider this objection for the first time on appeal. *See United States v. Lieberman,* 608 F.2d 889, 900 (1st Cir.1979), *cert. denied,* 444 U.S. 1019, 100 S.Ct. 673, 62 L.Ed.2d 649 (1980). What is more, since a defendant may waive his right to be present during the period of often routine voir dire questioning, *see The Virgin Islands v. George,* 680 F.2d at 15; *The Virgin Islands v. Brown,* 507 F.2d 186, 189 (3d Cir.1975), we believe it would be anomalous to hold that a defendant could not also waive any defect relating to the judicial officer who presided over the voir dire of petit jurors.

## VI

For the foregoing reasons, the judgments of conviction of defendants DeFiore and Galler are reversed as to counts five and eight. In all other respects, the judgments of conviction are affirmed.

WINTER, Circuit Judge, concurring in part and dissenting in part:

The indictment was framed to allege ten counts, each of which involved a particular phone call placed on a particular date. Two of the calls were never connected to the defendants and I concur in the majority's dismissal. The remaining eight calls were all placed from a particular phone in North Carolina to a bank in New York. The indictment alleged that each of these calls was a separate crime since each furthered a single scheme to defraud the State and City of New York and to deprive these authorities of tax revenue due on the sale of cigarettes.

The evidence showed that the defendants were engaged in purchasing cigarettes without a North Carolina tax stamp for resale. The seller customarily confirmed by phone that the purchase money had been deposited in a particular bank account in New York. Each of the eight counts involves such a phone call. The cigarettes were then loaded either into a truck camouflaged so as to make it appear that it was carrying pipe or into vans of ordinary appearance. Some of the cigarettes were transported to New York City and sold there. However, as the government conceded on oral argument, there was no proof as to where the great bulk of the cigarettes were transported and sold, and no connection was made between any one of the phone calls named in each count and the transportation and sale of cigarettes in New York.

Analysis must begin with the question of what the government was required to prove under the indictment as framed. Had the indictment alleged in one count a conspiracy to commit wire fraud, the proof was clearly sufficient. Had the indictment alleged in one count a scheme to defraud New York City and New York State of tax money and the use of the wires in furtherance of the scheme, the proof was also sufficient. Had the evidence shown that each call resulted in the use of the camouflaged truck to transport cigarettes to New York for resale there, I would join the majority in affirming the eight counts on the grounds that a deceptive act resulting in a fraud of New York had been proven.

Under the caselaw cited by the government, it must prove a scheme involving a false statement or other deception intended to cause a designated governmental authority to lose tax revenue. All the evidence showed, however, was a scheme to purchase and, presumably, sell cigarettes without a tax stamp. If deception of New York was proven, it was only in the occasional use of the camouflaged truck, one trip in that truck to New York City, and the sale of a small number of cigarettes there. None of the calls alleged in the eight counts involved the truck, the trip to New York or the sales. As framed, therefore, the indictment thus raises the very troublesome question of whether each and every use of the wires in any connection with a single scheme to defraud can be alleged and proven as a separate count.

Although there appears to be little authority directly on point, it would seem to me that some line drawing is in order.

Congress surely did not intend that the exposure to criminal liability should be so dependent upon the number of phone calls or wire transmissions made. For one thing the exposure is entirely random not only because small frauds may include multiple uses of the wires while large ones do not, but also because relatively innocuous uses of the wires are as criminal as those actually involving fraudulent communications. The theory of the government would render as criminal a would-be swindler's phoning for a pizza to allow him to eat while working as a call which is itself a fraudulent act. For another, the constitutional protection against double jeopardy becomes relatively meaningless since successive prosecutions need only allege different calls.

Such line drawing is not difficult. For example, the Congressional purpose would be fully effectuated by allowing a separate count for each conspiracy, a count for each scheme to defraud utilizing wire transmissions, and a separate count for each actual fraudulent act utilizing a wire transmission.

Under such a rule, the eight count indictment in the present case was not proven. Having chosen to frame the indictment as it did, the government was obligated to prove each element on each count. *United States v. Robinson,* 545 F.2d 301 (2d Cir.1976). This it failed to do. First, there is no proof that the cigarettes purchased as a result of any of the eight phone calls were sold in New York. That the laws, tax or otherwise, of that state or some other were violated, is simply assumed. Second, there has been no proof of either deception or a false statement in connection with any particular phone call. An act of deception might have been proven had the government shown use of the camouflaged truck in connection with the eight phone calls but it did not.

The legal theory of the conviction, therefore, is either that every use of the wires with some connection to a single scheme to defraud is a crime or that a wire fraud is made out by the use of a phone in connection with the simple non-payment of state or local taxes without proof either of deception or the identity of the taxing authority involved. I cannot accept either theory and, therefore, dissent.[1]

---

1. Affirmance renders into insignificance the Jenkins Act, 18 U.S.C. §§ 2341 *et seq.,* a federal criminal statute which specifically regulates trafficking in contraband cigarettes. This legislation, intended to provide federal assistance to states in collecting revenue due for the sale of cigarettes, spells out in detail the kinds of trafficking in contraband cigarettes which Congress believed to be sufficiently serious to call for federal intervention. For example, more than 60,000 cigarettes must be involved which contain no evidence of compliance with the state law where they are found if the particular state requires a procedure such as stamping. If the wire fraud legislation reaches every non-payment of state taxes on cigarettes, however, no federal prosecutor will ever have a reason to use the Jenkins Act even though it, rather than the wire fraud statute, is the product of Congressional study of the problem of contraband cigarettes.