**UNITED STATES of America, Appellee,**

**v.**

**William Joseph TRICE, Appellant.**

**UNITED STATES of America, Appellee,**

**v.**

**Rudolph John KEPKA, Appellant.**

**Hazen A. JOHNSON, Appellant,**

**v.**

**UNITED STATES of America, Appellee.**

**Nos. 87–2452, 87–2472 and 87–2540.**

United States Court of Appeals, Eighth Circuit.

Submitted June 17, 1988.

Decided Dec. 29, 1988.

Rehearing Denied March 7, 1989.

R. Scott Rhinehart, Sioux City, Iowa, for Trice.

Peter E. Van Etten, Sioux City, Iowa, for Kepka.

John Forrest M. Samore, Sioux City, Iowa, for Johnson.

Lester A. Paff and Willis A. Buell, Sioux City, Iowa, for appellee.

Before HEANEY and MAGILL, Circuit Judges, and LARSON,* Senior District Judge.

HEANEY, Circuit Judge.

Rudolph John Kepka, William Joseph Trice and Hazen Arvid Johnson appeal their convictions for conspiracy to and for possession of chemicals with intent to manufacture amphetamines.

In September of 1986, Roger Rasmussen visited Sioux City, Iowa, and met defendant Trice. In the next month or two, Trice visited Rasmussen and started inquiring about the chemical processes to make amphetamines. Rasmussen, being a high school chemistry teacher with a bachelor's degree in chemistry, was thought to have the expertise to manufacture amphetamines, and, because of previous criminal proceedings against him, was thought to be a likely candidate to be the chemist in a drug lab operation.

In March of 1987 Trice took Rasmussen to Mid West Cycle Harley–Davidson, Inc. in Sioux City, Iowa. Mid West was owned and operated by defendant Kepka. Rasmussen met with Kepka. Rasmussen gave Kepka the formula for making amphetamine and the various procedures to reach the final product. He informed Kepka as to the chemicals that were needed.

After Van Waters and Rogers Chemical Co. of Sioux City reported a purchase of acidic anhydride to the Sioux City Police Department, officers of that department witnessed the delivery of the chemical to defendants Kepka, Trice and Johnson on March 3, 1987. Because the police failed to successfully trail the defendants, the police did not know where the chemicals were taken. On April 16, 1987, ammonia hydroxide, another chemical used in the process, was picked up by one of the defendants. The vehicle used was later sighted at Kepka's garage, but nobody saw the chemicals taken into the garage.

Based on this information, the police kept the garage under surveillance. In a period of a couple days, the police observed the defendants leaving and entering the garage numerous times. During these visits, the defendants took bottles of distilled water and bags of ice into the garage. The doors to the garage were propped open, allowing the officers to smell a chemical odor coming from the garage.

On April 23, 1987, at approximately 2:35 a.m., officer Mark Skaff seized a garbage bag, without a search warrant, from a trash can placed on the street curb of Kepka's residence. The items seized became the basis for an opinion by a Drug Enforcement Administration (DEA) chemist that an amphetamine lab was being set up in the Kepka garage. A search warrant was obtained later that day with probable cause based on the chemical purchases, the items from the garbage bag and the chemist's opinion.

In the evening hours of April 23, 1987, the search warrant was executed on the Kepka garage and residence. Defendants Bekish, Kepka, Rasmussen, Trice and Johnson were arrested.

Initially, all five defendants were charged with the crimes of conspiracy and

* The HONORABLE EARL R. LARSON, United States Senior District Judge for the District of Minnesota, sitting by designation.

intent to manufacture a controlled Schedule II substance. Defendants Kepka, Trice and Rasmussen filed motions to suppress regarding the evidence seized from the garbage bags on Kepka's property. The court held hearings on these motions to suppress, first in court and then at Kepka's residence. It denied the motion to suppress.

Just before trial, co-defendant Rasmussen "turned over," becoming a witness for the government and testifying against the remaining defendants.

On August 31, 1987, the jury was selected, but not sworn. Voir dire was conducted in front of and by a federal magistrate. According to the appellants, the defendants were severely prejudiced by the magistrate's conduct. Objection to the magistrate conducting voir dire was raised the next day at the first opportunity in front of the trial judge and before the jury was sworn in. The motion was denied.

The trial of the case began on September 1, 1987, and continued until the matter was submitted to the jury on September 8, 1987. On the next day, the jury returned its verdict. Defendants Trice, Kepka and Johnson were found guilty. Defendant Bekish was acquitted.

The three defendants found guilty appeal. They raise several issues. Only two of the issues raised on appeal merit discussion:[1] seizure of the garbage and magistrate conducting voir dire. As to the first issue, we affirm, and as to the second issue, we reverse and remand.

## I. SEARCH OF KEPKA'S GARBAGE

■ Both Kepka and Johnson assert that the trial court erred by failing to suppress the evidence seized from the trash cans on Kepka's curb without a search warrant.

Defendants Kepka, Bekish and Rasmussen filed motions to suppress evidence derived from the warrantless seizure. After two suppression hearings, the lower court denied all motions to suppress. The court found that none of the defendants retained a legitimate privacy expectation in the can's contents because, although the can was technically on Kepka's property, the garbage was in public view and pedestrians had easy access. *U.S. v. Kepka, et al.,* slip op. at 5 (N.D.Iowa Order of July 21, 1987).

The Supreme Court recently faced the issue of a warrantless search and seizure of garbage bags left on a curb outside of a defendant's house in *California v. Greenwood,* —— U.S. ——, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988). A search in such instances violates the Fourth Amendment only if the defendants "manifested a subjective expectation of privacy in their garbage that society accepts as objectively reasonable." *Id.* —— U.S. at ——, 108 S.Ct. at 1628, 100 L.Ed.2d at 36 (citations omitted). Speaking particularly of garbage bags, the Court stated the following:

> It may well be that respondents did not expect that the contents of their garbage bags would become known to the police or other members of the public. An expectation of privacy does not give rise to Fourth Amendment protection, however, unless society is prepared to accept that expectation as objectively reasonable.

*Id.*

The Court then concluded in *Greenwood* that there is no reasonable expectation of privacy in garbage bags left, in an area accessible to the public, at the curb for collection. *Id.* —— U.S. at ——, 108 S.Ct. at 1629, 100 L.Ed.2d at 37.

■ *Greenwood* governs the instant case. While the garbage in *Greenwood*

---

**1.** The appellants raise several additional issues: Trice argues that the district court erred in not severing Trice's case from the cases of the other defendants because Kepka presented evidence implicating Trice and because of the admission of Johnson's earlier convictions. Both Trice and Johnson complain that the prosecutor in closing arguments violated *Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965). Kepka complains that hearsay evidence—a videotape of the interior of Kepka's

garage—was wrongfully admitted. Kepka and Johnson argue that the convictions should be overturned because of juror prejudice and improper polling of the jury, both based on a juror's statement. Johnson argues that the admission of his earlier guilty plea to a similar charge in 1981 violated Federal Rules of Evidence 404(b) and 403. Johnson also argues that his conviction was not supported by substantial evidence. All of these issues are without merit.

was merely placed in a bag and the trash at Kepka's property was kept in a garbage can, this difference does not give Kepka an *objectively* reasonable expectation of privacy. While a trash can is less accessible to animals than a garbage bag, a trash can placed at the curb is still readily accessible to children, scavengers, snoops and other members of the public. *See Greenwood,* —— U.S. at ——, 108 S.Ct. at 1628–29, 100 L.Ed.2d at 36–37. Moreover, Kepka places his trash in the can "for the express purpose of conveying it to a third party, the trash collector, who might himself have sorted through respondents' trash or permitted others, such as the police, to do so." *Id.* —— U.S. at ——, 108 S.Ct. at 1629, 100 L.Ed.2d at 37. A person must do more than place trash for collection in a trash can, that the public has access to, to create an objectively reasonable expectation of privacy. Kepka did not take that extra step.

## II. MAGISTRATE CONDUCTING VOIR DIRE

■ Voir dire was conducted by the magistrate in this case on August 31, 1987, in conformity with a local rule permitting such practice:

> Rule 1.6.3 Voir Dire: Unless otherwise ordered, voir dire examinations shall be conducted by a judge or a magistrate. Counsel may submit written questions to the court prior to voir dire examination, or at its conclusion, with the approval of the court, may submit oral questions to the prospective jurors. See FRCP 47; FRCrP 24.

The Magistrates Act of 1968,[2] and particularly section 636(b) of the Act, defining the scope of magistrates' power, has gone through a series of changes and constitutional challenges in the years since adoption. *See, e.g., U.S. v. Raddatz,* 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980); *Mathews v. Weber,* 423 U.S. 261, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976); *Wingo v. Wedding,* 418 U.S. 461, 94 S.Ct. 2842, 41 L.Ed.2d 879 (1974). In the Act's present language, section 636(b) provides:

> (1) Notwithstanding any provision of law to the contrary—
>
> (A) a judge may designate a magistrate to hear and determine any pretrial matter pending before the court, except a motion for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action. A judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate's order is clearly erroneous or contrary to law.
>
> (B) a judge may also designate a magistrate to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court, of any motion excepted in subparagraph (A), of applications for posttrial relief made by individuals convicted of criminal offenses and of prisoner petitions challenging conditions of confinement.
>
> (C) the magistrate shall file his proposed findings and recommendations under subparagraph (B) with the court and a copy shall forthwith be mailed to all parties.
>
> Within ten days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions.

*        *        *        *        *        *

**2.** 1968 U.S.Code Cong. & Admin.News 1280

(current version at 28 U.S.C. §§ 631–639).

(3) A magistrate may be assigned such additional duties as are not inconsistent with the Constitution and laws of the United States.

(4) Each district court shall establish rules pursuant to which the magistrates shall discharge their duties.

The present form of section 636(b) was created by amendment to the original section 636(b) in 1976.[3] The amendment was in response to *Wingo v. Wedding,* 418 U.S. 461, 94 S.Ct. 2842, 41 L.Ed.2d 879 (1974), where the Supreme Court held that the language of section 636(b) of the Magistrates Act of 1968 did not authorize magistrates to conduct evidentiary hearings in federal habeas corpus suits. The amended version of section 636(b) grants magistrates four powers. A judge may allow a magistrate to hear and determine, with a few specific exceptions, any *pretrial matter* under a clearly erroneous standard of review. 28 U.S.C. § 636(b)(1)(A). Secondly, a district judge may allow a magistrate to conduct hearings and make findings for disposition of any matter excepted to in the first part and make findings for disposition of applications for certain types of posttrial relief with de novo determination by the district judge. 28 U.S.C. § 636(b)(1)(B). The specific exceptions include *only* motions for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information, to suppress evidence in a criminal case, to dismiss or maintain a class action, to dismiss for failure to state a claim, and to involuntarily dismiss an action. 28 U.S.C. § 636(b)(1)(A). Thirdly, a "magistrate may be assigned such *additional duties* as

are not inconsistent with the Constitution and laws of the United States." 28 U.S.C. § 636(b)(3) (emphasis added). The final power, which does not apply in this case, deals with aspects of a magistrate serving as a special master, either by statute or by consent of the parties in civil cases. 28 U.S.C. § 636(b)(1). Nothing in section 636(b) explicitly deals with voir dire conducted by magistrates.

Four circuits have faced the issue of voir dire conducted by magistrates. The First Circuit faced the issue in *U.S. v. Rivera–Sola,* 713 F.2d 866 (1st Cir.1983). In that case, the First Circuit reviewed only for plain error under Fed.R.Crim.P. 52(b), and since Rivera demonstrated no prejudice, the Court found no error. *Id.* at 874.

In *U.S. v. DeFiore,* 720 F.2d 757 (1983), the Second Circuit also did not decide whether magistrates were authorized to conduct voir dire because the defendant had failed to make a contemporaneous objection and because it would be anomalous to hold that such an error could not be waived, since a defendant may waive his or her right to be present at voir dire. *Id.* at 765 (citing for the no contemporaneous objection explanation, *U.S. v. Lieberman,* 608 F.2d 889, 890 (1st Cir.1979), *cert. denied,* 444 U.S. 1019, 100 S.Ct. 673, 62 L.Ed.2d 649 (1980) and citing for the defendant's right to waive explanation, *The Virgin Islands v. George,* 680 F.2d 13, 15 (3rd Cir.1982)).

The Ninth Circuit in two cases addressed the validity of voir dire conducted by a magistrate. In *U.S. v. Bezold,* 760 F.2d 999 (9th Cir.1985), the Court upheld the magistrate's actions, even though the defendant timely objected. The panel for the

---

**3.** Section 636(b) of the 1968 Act provided:

Any district court of the United States, by the concurrence of a majority of all the judges of such district court, may establish rules pursuant to which any full-time United States magistrate, or, where there is no full-time magistrate reasonably available, any part-time magistrate specially designated by the court, may be assigned within the territorial jurisdiction of such court such additional duties as are not inconsistent with the Constitution and laws of the United States. The additional duties authorized by rule may include, but are not restricted to—

    (1) service as a special master in an appropriate civil action, pursuant to the applicable

provisions of this title and the Federal Rules of Civil Procedure for the United States district courts;

    (2) assistance to a district judge in the conduct of pretrial or discovery proceedings in civil or criminal actions; and

    (3) preliminary review of applications for posttrial relief made by individuals convicted of criminal offenses, and submission of a report and recommendations to facilitate the decision of the district judge having jurisdiction over the case as to whether there should be a hearing.

Court found that since adequate review and control remained in the district court, no Article III concerns were affected. *Id.* at 1002. Several conditions that the Court found relevant were that the district court could exercise its review because the judge had wide discretion to disqualify jurors after the trial began, the judge had access to voir dire transcript, and the judge could observe the jury during trial. *Id.*

In *U.S. v. Peacock*, 761 F.2d 1313 (9th Cir.), *cert. denied*, 474 U.S. 847, 106 S.Ct. 139, 88 L.Ed.2d 114 (1985), another panel for the Ninth Circuit found that Congress intended to include voir dire within the "additional duties" provision of section 636(b)(3). *Id.* at 1317. The Court then determined that such a statutory authorization comports with Article III of the Constitution so long as de novo review is available in district court. *Id.* at 1318 (citing *U.S. v. Raddatz*, 447 U.S. 667, 673–76, 100 S.Ct. 2406, 2411–13, 65 L.Ed.2d 424 (1980); *Pacemaker Diagnostic Clinic, Inc. v. Instromedix, Inc.*, 725 F.2d 537, 546 (9th Cir.) (en banc) (alluding to de novo review of all referrals under section 636(b)), *cert. denied*, 469 U.S. 824, 105 S.Ct. 100, 83 L.Ed. 2d 45 (1984)).

The most recent exploration of this issue was by the Fifth Circuit in *U.S. v. Ford*, 824 F.2d 1430 (5th Cir.1987). The court detailed the history of the Magistrates Act of 1968 through the amendments of 1976 and analyzed *U.S. v. Raddatz*, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980), in which a majority of the Supreme Court held that magistrates could hold hearings on motions to suppress so long as there is opportunity for de novo determination by district judges of such rulings. The Fifth Circuit determined that *Raddatz* stood for two propositions:

> *Raddatz* furnishes two relevant insights. First, if Congress intended that magistrates could be assigned the additional duty of presiding over the trial of felony cases, the struggle over petty offenses in the 1968 Act and the concerns over pretrial ruling authority, explicitly provided for, would make no sense. Similarly, if the Court believed that to be the intent of Congress, the *Raddatz* majori-

ty's effort to distinguish pretrial and trial would be superfluous.

> We need not decide whether Congress has the power to allow a district judge to delegate the trial of felony cases to a magistrate. It is sufficient here to simply observe that such a construction would pose grave constitutional issues. We are obligated, of course, to read statutes to avoid constitutional difficulty. Relatedly, we insist upon clear congressional expression when the reach of claimed reading provokes issues regarding constitutionally mandated spheres of governmental power. * * * In short, we do not lightly engage such fundamental issues, but rather we properly avoid them when we may fairly do so. We are then not persuaded that Congress intended to grant to district judges the power to delegate the trial of felony cases themselves.

*Ford,* 824 F.2d at 1434–35 (footnote omitted).

In addition, the *Ford* Court found that voir dire was sufficiently important to trial to give rise to serious due process concerns. *Id.* at 1435–36. The Court also resolved, contrary to the Ninth Circuit, that de novo determination by an Article III judge of a magistrate's handling of jury selection would be practically impossible and truly illusory. *Id.* at 1436. The Fifth Circuit concluded:

> Simply put, whatever the power of Congress may be, we are not persuaded that Congress intended that "additional duty" include presiding over jury selection in felony cases. The district court erred in allowing the magistrate to preside over the selection of the jury. But because Lois Ford did not object and because the trial was fundamentally fair, Ford's appeal was denied.

*Id.* at 1438–39.

We agree with the Fifth Circuit that Congress did not intend to delegate to magistrates the authority to conduct voir dire under section 636(b) of the Magistrates Act.

## A. SECTION 636(b)(1)(A): PRETRIAL MATTERS

Initially, we must inquire whether voir dire is significantly preliminary to and distinct from trial to be considered a "pretrial matter" for purposes of section 636(b)(1)(A). Under this subparagraph, a judge may, on a case-by-case basis or by a local rule, designate a magistrate to *hear and determine* any pretrial matter.

The importance of voir dire to the American legal system is tied to the role juries play in our legal system, as well as the interplay between judge and jury. Juries have both practical and political roles. The practical roles include a jury's collective memory and its community insight. More importantly, juries have several political roles, including the maintenance of public confidence in the judicial process and the communication of the spirit of the law to the community. Also, juries act to reallocate power between the parties, the people and the state.

One sees the importance of the political role of juries in the history of the jury as a legal institution. Initially, juries were established by the government or royalty as a means of establishing its own rights. Plucknett, *A Concise History of the Common Law* 108–11 (5th Ed.1956). Government, at that time, had little faith in the production of witnesses by the parties disputing the claim. *Id.* Soon after, private litigants began to seek favor from the king so that they could have the privilege of having their rights ascertained by a jury. *Id.* at 110. The modern petit jury began to take its present form in the thirteenth century in England. *Id.* at 120. Juries came to have great power, nearly indisputable authority as to both law and fact. *Id.* at 131. This "indisputable authority" led to reforms. Fear of the jury led judges to exercise greater control over them, even in the selection process. *Id.* at 120–24.

Elements of voir dire continue to implicate greater societal rights. *Batson v. Kentucky,* 476 U.S. 79, 87, 106 S.Ct. 1712, 1717–18, 90 L.Ed.2d 69 (1986). Improper jury selection can undermine public confidence in the judicial process. *Id.,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Voir dire communicates to the people by satisfying the axiom that to perform its highest function in the best way justice must satisfy the appearance of justice. *Swain v. Alabama,* 380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965). An element of voir dire, the peremptory challenge, arguably protects the state from prejudice, shifting power away from the people to the government. *Id.* 380 U.S. 202, at 220, 85 S.Ct. 824, at 835, 13 L.Ed.2d 759 (1965).

Under both a historical light and a light cast by Supreme Court opinions, jury selection plays a vastly greater role than merely assuring defendants' rights. As Judge Higginbotham stated in *Ford:*

> Such concern plainly rejects the view that jury selection is a preliminary and essentially ministerial act. At the least it is an essential instrument to the delivery of a defendant's constitutionally secured right to a jury trial rooted in the commands of due process, if not the trial guarantees of the sixth amendment and section 2 of article III themselves.

*U.S. v. Ford,* 824 F.2d 1430, 1435 (5th Cir.1987) (footnotes omitted).

Since voir dire plays broader societal roles, we suspect that Congress did not intend to treat voir dire as simply preliminary.[4] Voir dire is largely related to the

---

4. The reports to subcommittee hearings and the statements by members of Congress provide little evidence that Congress intended to include voir dire under subparagraph (A).

The House Report on the 1976 amendments to the Magistrates Act stated:

The purpose of the bill is to amend section 636(b), title 28 United States Code, in order to clarify and further define the additional duties which may be assigned to a United States Magistrate in the discretion of a judge of the district court. These additional duties generally relate to the hearing of motions in both criminal and civil cases, including both *preliminary procedural motions* and certain dispositive motions.

H.R.Rep. No. 1609, 94th Cong., 2d Sess. 2, *reprinted in* 1976 Code Cong. & Admin.News 6162, 6162 (emphasis added).

On the other hand, the House Report found a speech, submitted as a statement to a Senate hearing on July 16, 1975, by Chief Judge Belloni

task of deciding cases, similar to the matters excepted to in subparagraph (A), rather than the task of either fact gathering or charging, similar to matters traditionally envisioned by subparagraph (A). Subparagraph (A) was plainly intended for less important matters than voir dire.

### B. SECTION 636(b)(1)(B): EXCEPTIONS TO SUBPARAGRAPH (A)

Subparagraph (B) authorizes the delegation of certain specific powers to magistrates:

> [A] judge may also designate a magistrate to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court, of any motion excepted in subparagraph (A), of applications for posttrial relief made by individuals convicted of criminal offenses and of prisoner petitions challenging conditions of confinement.

28 U.S.C. § 636(b)(1)(B).

Congress intended this provision to authorize the delegation of a specific but limited list of powers. Voir dire is not included in that list.

### C. SECTION 636(b)(3): ADDITIONAL DUTIES

Section 636(b)(3) provides: "A magistrate may be assigned such additional duties as are not inconsistent with the Constitution and laws of the United States." [5] On its face, section 636(b)(3) appears to be all-inclusive, but the section is limited by accompanying provisions and the entire structure of section 636(b).

The structure of section 636(b) implies both a timeline and a diversity of character belonging to the different authorizations granted to magistrates under the Act. As we have seen, subparagraph (A) governs all pretrial matters, but a broad reading of the additional duties provision renders subparagraph (A) superfluous, suggesting that the "additional duties" provision is intended for matters after the trial begins. In terms of the character of voir dire being fact determining rather than fact gathering, *see United States v. Ford*, 824 F.2d at 1436, voir dire belongs among the motions authorized by subparagraph (B). But voir dire was not included under subparagraph (B). Neither the timing nor the character of voir dire suggest its inclusion under the "additional duties" provision.

Looking at the legislative history to determine those duties intended to be within the scope of "additional duties" is not an exact science. Congress was clear that it did not intend to limit the "additional duties" provision to specific powers that had been delegated to magistrates in the past. Congress wanted to leave district judges "free to experiment." H.R.Rep. No. 1609, 94th Cong.2d Sess. 12, *reprinted in* 1976 U.S.Code Cong. & Admin.News 6162, 6172. Unfortunately, the pronouncement of "free to experiment" offers no real guide as to the line before such power extends beyond congressional authorization and raises serious constitutional questions.

The legislative history does, however, announce the purpose of the "additional duties" provision.

> If district judges are willing to experiment with the assignment to magistrates

---

of the District of Oregon made to the National Association of United States Magistrates, to be important. *Id.* at 9, *reprinted in* 1976 U.S.Code Cong. & Admin.News 6162, 6169.

> Even when the district judges are able to take all the cases, one trial follows another so closely that in order to get to the next case without delay, Judge Juba [a magistrate] will receive the verdict in a case tried by one of the other·judges and he will preside over the voir dire and jury selection of a trial to begin momentarily before a judge who is putting the finishing touches on his current case.

·Hearing on S. 1283 Before the Subcomm. on Improvements in Judicial Machinery of the Sen-

ate Comm. on the Judiciary, 94th Cong., 1st Sess. 39 (July 16, 1975).

This alone is not sufficient to demonstrate that Congress intended to include voir dire in the amended version.

**5.** *If the district court relied on the Legal Manual for United States Magistrates to formulate the local rule authorizing the conducting of voir dire, the court then concluded that voir dire was authorized by the "additional duties" provision. Administrative Office of the United States Courts, Legal Manual for United States Magistrates § 3.10(3).*

of other functions in aid of the business of the courts, there will be increased time available to judges for the careful and unhurried performance of their vital and *traditional adjudicatory duties,* and a consequent benefit to both efficiency and the quality of justice in the Federal courts.

*Id., reprinted in* 1976 U.S.Code Cong. & Admin.News 6162, 6172 (emphasis added). As we have seen from the history of the rise of juries, the conducting of voir dire is a "traditional adjudicatory duty" of a trial judge. While one could possibly conclude that voir dire is within the overly broad language of section 636(b)(3), we feel that that conclusion defeats the purpose of the additional duties provision.

■ After concluding—as we have—that Congress did not intend to grant magistrates the power to conduct voir dire, the Fifth Circuit then rejected the defendant's appeal on the ground that the defendant waived this error by failing to seasonably object and that this error was harmless. Unlike *Ford,* we find, however, that the defendants objected to this error at the first opportunity before a trial judge. This, in our view, was a timely objection. Indeed, the defendants made the objection to the only person with authority to conduct voir dire.

We reverse and remand with instructions to grant a new trial, at which voir dire will be conducted by the trial judge.

LARSON, Senior District Judge, concurring in part, dissenting in part.

I concur in the majority's holding that the trial judge, not the magistrate, should have presided over the jury selection in this case. I write separately because I do not agree that defendants are entitled to a new trial on this basis.

The majority states that the defendants objected to the magistrate conducting voir dire at the first opportunity before the trial judge. My review of the record and the briefs indicates that defendants did not object to the empaneling of the jury by the magistrate, but only objected to the *manner* in which the magistrate conducted voir dire.

In denying the defendants' motions for a new trial, the district court referred to defendants' arguments that the magistrate unduly restricted them and was impatient with them. The district court stated, however, that the defendants did not object to the selection of the jury by the magistrate. The district court stated further that counsel had the opportunity to object and that the court would have been available to consider their objections had they so desired.

Only after the district judge invited comment at the posttrial hearing on the Fifth Circuit's decision in *United States v. Ford,* 824 F.2d 1430 (5th Cir.1987), did the issue of the magistrate's authority to preside over voir dire arise. Defendants argued before the district court that their failure to object was immaterial, and the court in my view properly rejected this argument.

After an eight day trial, the jury convicted the three appealing defendants and acquitted one defendant. The jury correctly applied the reasonable doubt requirement and the defendants had a fair trial. Another eight day trial would not produce a different result. Accordingly, I would hold, as the *Ford* court held, that because defendants failed to object to the magistrate conducting voir dire, and because their trial was fundamentally fair, their convictions should be affirmed. *See id.* at 1438–39.